**UNITED STATES of America, Appellee,**

v.

**Edward LANGFORD, M.D., Defendant–Appellant.**

**No. 852, Docket 92–1353.**

United States Court of Appeals, Second Circuit.

Argued Feb. 10, 1993.

Decided April 5, 1993.

Joseph M. Guerra, III, Asst. U.S. Atty., Buffalo, NY (Dennis C. Vacco, U.S. Atty., W.D.N.Y., on the brief), for appellee.

Douglas W. Rhodes, Buffalo, NY (Edwin Gonzalez, on the brief), for defendant-appellant.

Before VAN GRAAFEILAND, KEARSE, and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Edward Langford, M.D., appeals from a final judgment of the United States District Court for the Western District of New York, entered following a jury trial before Richard J. Arcara, Judge, convicting him on five counts of dispensing controlled substances in violation of 21 U.S.C. § 841(a)(1) (1988); five counts of aiding and abetting the unlawful distribution of the same substances, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (1988); and conspiracy to commit those offenses, in violation of 21 U.S.C. § 846 (1988). Langford was sentenced principally to 151 months' imprisonment, to be followed by three years' supervised release. On appeal, he contends principally that he is entitled to a new trial because a juror deliberately failed to answer truthfully a question during the jury selection process. For the reasons below, we find no basis for reversal, and we therefore affirm.

## I. BACKGROUND

### A. *The Events and the Conviction*

A 13-count indictment charged that from approximately January to October 1988, Langford, a physician, unlawfully dispensed prescriptions for a variety of controlled substances. The evidence at trial, the sufficiency of which is not challenged, showed that Langford sold the prescriptions to three persons, Emma Latham, Therman Johnson, and Ronald Wilk, who had them filled and sold most of the drugs. During that period Langford wrote more than 1,500 prescriptions in the names of some 24 persons. Most of the names were provided to Langford by Latham and Johnson; the amounts prescribed greatly exceeded any amount that could have been prescribed legitimately; and no more than one or two of the persons in whose names the prescriptions were written had been Langford's patients.

In addition to placing in evidence 1,577 such prescriptions written during the period covered by the indictment, together with evidence that Langford had written them and had falsely denied having written certain of them, the government introduced testimony by Latham as to her relationship with Langford dating back to 1983. Latham had become Langford's patient in about 1985 and at that time began paying him to write unlawful prescriptions. She told Langford she was selling the drugs. She would visit him every other day and receive 8–20 prescriptions, for which she usually paid him $200–400 and occasionally paid him as much as $1,000. Her purchases continued through the period covered by the indictment. In late 1985, when Langford needed additional money, Latham introduced him to Johnson. Langford proceeded to sell numerous prescriptions to Johnson and his associate Wilk, until Wilk was arrested in October 1988.

Prior to submission of the case to the jury, one count of distribution and one count of aiding and abetting were withdrawn on motion of the government. The jury found Langford guilty on the remaining 11 counts of the indictment.

### B. *The Juror Question*

After the jury returned its verdict, Langford moved pursuant to Fed.R.Crim.P. 33 for a new trial on the ground, *inter alia*, that juror Vanessa James had concealed during the jury selection process that she had a criminal record. In the voir dire, the court had asked prospective jurors whether

they or any close friends had "ever been arrested or charged with any offense, federal[ or] state." One potential juror stated that he had previously been arrested for possession of marijuana; another stated that her brother had been arrested in a foreign country for a drug offense. James made no disclosure in response to the court's question. In support of his Rule 33 motion, Langford's attorney submitted an affidavit stating that the attorney had been told by one of James's neighbors that James had been convicted of crimes. The attorney then investigated James's record and found a number of arrests and convictions. The district court held an evidentiary hearing on the motion.

The hearing revealed that during the period 1974–1976, James had been arrested three times and charged with prostitution. The arrests resulted in one conviction of a noncriminal infraction, one conviction of a B misdemeanor, and one acquittal. In addition, in 1985, she had been charged with grand larceny, resulting in a conviction of an A misdemeanor with a sentence of conditional discharge.

At the hearing, James testified that she had not mentioned the 1985 larceny charge because she believed it had ultimately not resulted in a record of arrest or conviction. She stated that it had been her understanding that if she repaid the welfare money that was the basis of that charge, the charge would be dropped and the record expunged. She had repaid the money and believed she had no record of a larceny arrest or conviction.

James acknowledged, however, the accuracy of the record with respect to her arrests in the mid–1970's on prostitution charges. At the time of the trial in 1991, James was employed as a mental health assistant and had just taken board examinations to become a nurse; she had a six-year-old daughter and taught Sunday School. She testified that she had not disclosed the prostitution arrests or convictions because the disclosures would have caused her substantial embarrassment.

James also testified that she had no particular interest in being on the jury to try Langford. She did not know him and had never had any contact with him prior to trial. She testified that she was in no way biased or prejudiced against him. No contradictory evidence was offered. Her neighbor who had spoken to Langford's attorney and who was a friend of Langford, testified that James had never exhibited any hostility toward or dislike of Langford.

After the hearing, the district court denied Langford's motion for a new trial. In a Decision and Order dated December 12, 1991 ("Decision"), it found James's testimony to be

> credible, despite the fact that she withheld the information concerning her prior arrests during *voir dire*. The Court is convinced that the only reason Ms. James withheld this information was to save herself embarrassment. She was not trying to get on the jury, and she had no animosity or "axe to grind" against Langford. There was absolutely no evidence introduced at the hearing to show that Ms. James was in any way biased or prejudiced against Langford.

Decision at 4.

The court rejected Langford's contention that proof that James had deliberately withheld the truth entitled him automatically to a new trial. Rather, it ruled that in order to succeed in his motion, Langford was required to prove "(1) that Ms. James failed to answer honestly a material question on *voir dire;* and (2) that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 6. It found that the second element was unproven. The court noted that none of the convictions was for a felony, which would have automatically disqualified her from sitting on the jury. It found that the prostitution arrests, having occurred 15 or more years before jury selection, did not indicate any bias or prejudice against Langford. And it found that "the evidence at the hearing and otherwise in the record shows absolutely no bias, prejudice or hostility on the part of Ms. James against Langford." *Id.* at 7. Concluding that Langford had not shown that James would have been excusable for

cause, the court denied the motion for a new trial.

Judgment was entered sentencing Langford as indicated above, and this appeal followed.

## II. DISCUSSION

On appeal, Langford contends principally that a juror's intentional nondisclosure of information during voir dire raises "a per se presumption of bias" that entitles him to a new trial. In addition, he contends that the district court erred in admitting Latham's testimony as to crimes committed by Langford prior to the period covered by the indictment, and in calculating his sentence. We reject all of his contentions. Only the voir dire issue requires extended discussion.

### A. *Juror Nondisclosure*

■ The Supreme Court addressed the principles governing a party's right to a new trial on the ground of juror nondisclosure during voir dire in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (*"McDonough"*). There, a juror had given an honest, though mistaken, response to a voir dire question. The Court observed that

> [o]ne touchstone of a fair trial is an impartial trier of fact—"a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 [102 S.Ct. 940, 946, 71 L.Ed.2d 78] (1982). *Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious.

*McDonough*, 464 U.S. at 554, 104 S.Ct. at 849. The Court noted, however, that the judicial system cannot be held to a standard of perfection, and that unless the correct disclosure would have provided a basis for a challenge for cause, a new trial was not required:

> [T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*Id.* at 556, 104 S.Ct. at 850. We read this multi-part test as governing not only inadvertent nondisclosures but also nondisclosures or misstatements that were deliberate, for though the *McDonough* Court began with the inadvertent response before it, it stated that the further showing of cause must be made even after a juror's "failure to answer honestly," and it hypothesized that there could be various "motives for concealing." Concurring in the judgment, Justice Brennan similarly stated that a second element—bias—should be required even if the juror's erroneous response was deliberate. Thus, he stated that the

> proper focus when ruling on a motion for new trial in this situation should be on the bias of the juror and the resulting prejudice to the litigant....
>
> ... Whether the juror answered a particular question on *voir dire* honestly or dishonestly, or whether an inaccurate answer was inadvertent or intentional, are simply factors to be considered in th[e] ... determination of actual bias.

*Id.* at 557–58, 104 S.Ct. at 851 (Brennan, J., concurring in the judgment).

In *United States v. Colombo*, 869 F.2d 149 (2d Cir.1989) (*"Colombo I"*), we dealt directly with the matter of a juror who was alleged to have given a response that was intentionally false. Following the trial in *Colombo I*, a criminal prosecution, the defense presented an affidavit from one juror ("Kennedy") reporting conversations she claimed to have had with another juror

("Geller"). The prospective jurors had been asked during the voir dire whether any of their relatives were lawyers or had ever been involved in law enforcement, and Geller had answered each question in the negative. According to the Kennedy affidavit, however, Geller told Kennedy that Geller in fact had a brother-in-law who was an attorney for the government and that Geller did not disclose this during the voir dire because she wanted to sit on the case. Further, Geller was alleged to have told Kennedy that she lived near a certain restaurant in which the defendants were alleged to have met to discuss their criminal plans, and that Geller " 'knew it was a hang out for gangsters.' " 869 F.2d at 150.

Viewing these statements as bespeaking both a knowledge of evidentiary facts and a view as to the merits of the case, we concluded that "if the Kennedy affidavit is to be credited, the juror's motive in lying on the *voir dire* was precisely to prevent defense counsel or the magistrate from acting on information the juror believed might lead to her dismissal from the case." *Id.* at 151. Thus, we noted that if Geller had indeed made the statements attributed to her in the Kennedy affidavit, those statements "indicated an impermissible partiality." *Id.* Accordingly, we remanded for a determination of whether in fact Geller's brother-in-law was an attorney for the government, stating that an affirmative finding would reveal sufficient corroboration for the Kennedy affidavit to require a new trial. *Id.* at 152.

On remand, the district court found, after a hearing, that Geller had not deliberately lied and that she had no motive to lie. It also found that Kennedy was sympathetic to the appellant, that Kennedy herself had lied in an affidavit statement about a third juror, and that Kennedy's own credibility was suspect. The district court therefore found no basis for a new trial. The court's findings not being clearly erroneous, that ruling was affirmed on appeal. *See United States v. Colombo*, 909 F.2d 711, 713 (2d Cir.1990) ("*Colombo II*"); *see also id.* at 715 (granting new trial on other ground).

Langford argues that *Colombo I* established a *per se* rule that a juror's intentionally false response on voir dire is an automatic ground for a new trial. Even if we did not view *McDonough* as establishing a multi-factor test applicable to intentional as well as inadvertent nondisclosures, we would reject Langford's interpretation of *Colombo I*. Though we stated there that voir dire should elicit sufficient information " 'to permit a defendant to intelligently exercise not only his challenges for cause, but also his peremptory challenges,' " *Colombo I*, 869 F.2d at 151 (quoting *United States v. Barnes*, 604 F.2d 121, 142 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980)), and we noted that the appellant would have been prevented from exercising those challenges intelligently if there had been an intentional nondisclosure as alleged, our holding focused on the allegations then before us. While we noted that the case before us differed from *McDonough* in that the response there had been " 'mistaken, though honest,' " *Colombo I*, 869 F.2d at 152 (quoting *McDonough*, 464 U.S. at 555, 104 S.Ct. at 849), that distinction served merely to underscore the allegations that Geller had responded falsely "in order to serve as a juror" in that case, *Colombo I*, 869 F.2d at 152, a matter in which she apparently held some view as to the merits. Thus, we did not suggest a *per se* rule based simply on whether a prospective juror had lied, without respect to whether the dishonesty had a bearing on her impartiality. Rather, we held that a juror who claims to know that a locale at which the evidence will place the defendant is a " 'hang out for gangsters,' " and who has deliberately responded falsely to a material question on voir dire precisely because she wanted to sit on the case, should be presumed not to be impartial.

The present case is significantly different from *Colombo I*. Though James intentionally failed to give truthful information in response to the voir dire, the court found, after the evidentiary hearing, that she did so only to avoid embarrassment. There was no suggestion here that James had any evidentiary knowledge relating to Langford's case. Nor was there any evi-

dence that she gave false answers because of any desire to sit on the jury. The district court found that there was "absolutely no evidence" that James was in any way biased or prejudiced against Langford. The court's findings that James was not trying to get on the jury and that she was impartial are not clearly erroneous. We conclude that the district court properly denied Langford's motion for a new trial.

### B. *Other Contentions*

Pursuant to Fed.R.Evid. 404(b), the trial court allowed the government, over Langford's objection, to introduce Latham's testimony as to her pre–1988 unlawful dealings with Langford. The court ruled that the testimony was relevant to show the background of the conspiracy and to explain the respective roles of Latham and Johnson; it also ruled that the testimony would not be unduly prejudicial because it constituted but a small part of the government's proof, *see* Fed.R.Evid. 403. Langford challenges the admission of that testimony on the grounds (a) that the pre–1988 events should not have been admitted because they predated the period covered by the indictment, and some of the events predated even Langford's meeting Johnson, and (b) that the admission of the testimony was unduly prejudicial. These contentions are meritless.

The trial court has broad discretion to admit "other crimes" evidence under Rule 404(b), and its ruling will not be overturned on appeal absent abuse of discretion. *See, e.g., United States v. Brennan*, 798 F.2d 581, 589 (2d Cir.1986), *cert. denied*, 490 U.S. 1022, 109 S.Ct. 1750, 104 L.Ed.2d 187 (1989). It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history. *See, e.g., United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir.1992) (evidence admissible "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between

participants in the crime developed"); *United States v. Angelilli*, 660 F.2d 23, 38–39 (2d Cir.1981), *cert. denied*, 455 U.S. 910, 945, 102 S.Ct. 1258, 1442, 71 L.Ed.2d 449, 657 (1982); *United States v. Magnano*, 543 F.2d 431, 435 (2d Cir.1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977). Further, changes in membership do not necessarily convert a single conspiracy into multiple conspiracies, *see, e.g., United States v. Martino*, 664 F.2d 860, 876–77 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *United States v. Vila*, 599 F.2d 21, 24 (2d Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979), especially where the activity of a single person "was central to the involvement of all," *United States v. Moten*, 564 F.2d 620, 625 (2d Cir.), *cert. denied*, 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977).

Here, the relevance of Latham's prior dealings with Langford was plain. Latham was essentially the instigator of the conspiracy, having suggested the unlawful course of action to Langford in 1985. It was she who, when Langford needed more money, brought him Johnson as a second outlet for his unlawful prescriptions. We see no abuse of discretion in the rulings that the evidence was relevant and that its probative value was not outweighed by its potential for unfair prejudice.

Langford's challenge to the calculation of his sentence, asserting that the record was insufficient to permit the court to make certain findings by a preponderance of the evidence, is frivolous. There was ample testimony to support the findings, and that testimony was explicitly credited by the sentencing court, whose assessments of witness credibility may not be second-guessed.

### CONCLUSION

We have considered all of Langford's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.