William Quentin JONES,
Petitioner–Appellant,

v.

Roy COOPER, Attorney General, State of North Carolina; R.C. Lee, Warden, Central Prison, Raleigh, North Carolina, Respondents–Appellees.

No. 01–25.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 25, 2002.

Decided Nov. 14, 2002.

**ARGUED:** Kenneth Justin Rose, Center for Death Penalty Litigation, Inc., Durham, North Carolina, for Appellant. Edwin William Welch, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Gretchen Marie Engel, Center for Death Penalty Litigation, Inc., Durham, North Carolina, for Appellant. Roy Cooper, North Carolina Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellees.

Before WIDENER, LUTTIG, and WILLIAMS, Circuit Judges.

Dismissed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WIDENER and Judge WILLIAMS joined.

## OPINION

LUTTIG, Circuit Judge.

Appellant, a North Carolina state prisoner under sentence of death, requests a certificate of appealability from this court, to review an order dismissing his petition for a writ of habeas corpus. He contends that a juror lied on a jury questionnaire and during voir dire, violating his right to a fair and impartial jury, and that the State of North Carolina suppressed exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As appellant has not made a substantial showing of the denial of a constitutional right, we are without authority to issue a certificate of appealability. Accordingly, we dismiss his appeal.

### I.

Shortly before midnight on March 7, 1987, appellant (wearing a ski mask and carrying an Uzi 9mm pistol) entered a Raleigh area Fast Fare store and fired several times, wounding Orlando Watson and fatally wounding Ed Peebles. Appellant then demanded that Charles Taylor, the store's clerk, open the cash register. When Taylor was unable to do so, appellant grabbed the register and pulled it out the front door by its cord and dragged it

for several feet before abandoning it and fleeing.

Appellant was pursued on foot by police officers and quickly apprehended. He was taken to the police station and interrogated throughout the morning of March 8, 1987, before being transferred to the Wake County Detention Center. There, a jailor observed him and, noting appellant's behavior and appearance, recorded in a jail shift log that appellant was "extremely suicidal." This jail log was never turned over to appellant, nor apparently were the jailor's observations made available to the appellant, despite appellant's discovery requests for exculpatory information.

Appellant eventually pled guilty to first-degree murder and was sentenced to death. The North Carolina Supreme Court vacated his death sentence and remanded for a new sentencing hearing in light of *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). At the re-sentencing hearing, appellant argued that several North Carolina statutory mitigating factors were present, including that he was suffering from a mental and emotional disturbance (due to being high on drugs), and that he showed remorse or sorrow for his actions. No juror found either of these mitigating factors, and the jury sentenced appellant to death. The North Carolina Supreme Court affirmed this sentence.

On August 29, 1995, appellant filed a Motion for Appropriate Relief ("MAR"), North Carolina's procedural mechanism for state post-conviction relief. In his MAR, appellant argued, among other claims, that a sentencing juror lied on a jury questionnaire and in voir dire, preventing appellant from being able to challenge her peremptorily or for cause. In support of this claim, appellant submitted an affidavit from an investigator who had interviewed the juror. The state court, relying on an unspecified state rule of evidence, quashed the affidavit and dismissed the MAR.

Some time after the filing of his first MAR, appellant's post-conviction counsel discovered the location of the jail log and obtained it, thereby learning the jailor's identity. When interviewed, the jailor expressed the opinion that appellant, on the morning of his booking in the Wake County Detention Center, looked as if he were crashing from a drug high and seemed remorseful while speaking with his grandfather on the telephone.

With this information, appellant filed a second MAR, alleging that the State violated the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to turn over the jail log and the identity of the jailor. In the alternative, appellant argued that trial counsel was ineffective for failing to uncover this information. The state court rejected both claims, on the alternative grounds that the claims were procedurally defaulted, as they could have been brought either on direct appeal or in the first MAR, and that the information allegedly suppressed was not material and appellant did not suffer any prejudice.

Appellant then filed a habeas petition in federal court, raising the above claims as well as several others. The district court dismissed the petition as to all claims. Appellant now requests the issuance of a certificate of appealability, contending that the district court erred when, without at least holding an evidentiary hearing, it dismissed his claims.

## II.

Before an appeal can be taken to the court of appeals from the final order in a habeas corpus proceeding arising out of process issued by a State court, a certifi-

cate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(A). "A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). A habeas petitioner thus must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)).

## A.

■ Turning first to appellant's juror misconduct claim, the Sixth Amendment, made applicable to the states through the Fourteenth Amendment, *see Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), requires that a state provide an impartial jury in all criminal prosecutions. "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois,* 504 U.S. 719, 727, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). If "even one [partial] juror is empaneled" and the death sentence is imposed, "the State is disentitled to execute the sentence." *Id.* at 728, 112 S.Ct. 2222.

■ In *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), the Supreme Court set forth a particularized test for determining whether a new trial is required in the context of juror deceit during voir dire or on jury questionnaires. That two-part test states that in order to obtain a new trial, the defendant "must first demonstrate that a juror failed to answer honestly a material question ... and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556, 104 S.Ct. 845. The Court noted that a "trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination." *Id.* at 555, 104 S.Ct. 845. Although in *McDonough* the juror's incorrect response in voir dire was an honest mistake, the test applies equally to deliberate concealment and to innocent non-disclosure, as our sister circuits have held. *See, e.g., Zerka v. Green,* 49 F.3d 1181, 1185 (6th Cir.1995); *United States v. Langford,* 990 F.2d 65, 68 (2d Cir.1993); *Artis v. Hitachi Zosen Clearing, Inc.,* 967 F.2d 1132, 1141–42 (7th Cir.1992); *Burton v. Johnson,* 948 F.2d 1150, 1158 (10th Cir. 1991); *United States v. St. Clair,* 855 F.2d 518, 522–23 (8th Cir.1988); *United States v. Scott,* 854 F.2d 697, 698 (5th Cir.1988). Although *McDonough* was a federal civil case on direct appeal, rather than a state criminal case on federal habeas review, we have expressly recognized its applicability also to federal habeas review. *See Fitzgerald v. Greene,* 150 F.3d 357, 362–63 (4th Cir.1998). The *McDonough* test is not the exclusive test for determining whether a new trial is warranted: a showing that a juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new trial. *See Fitzgerald,* 150 F.3d at 363. Appellant raises both variations of this juror miscon-

duct claim in his briefs before this court.[1]

### B.

In her affidavit, appellant's investigator reported that the challenged juror stated that several of her relatives had been subjected to arrests or jury trials; that she had gone to the Fast Fare the day after the murder and robbery; that she had strong, religiously-motived views in favor of the death penalty; and that she "knew that [appellant] had previously received a death sentence." J.A. 350–51. The investigator also reported that the juror had worked with law enforcement on one occasion in 1974, and that she had a strong dislike of illegal drug use (arising out of her relatives' use and sale of illegal drugs). *Id.*

On the jury questionnaire, the juror stated "no" in response to questions asking whether any friends, family, or acquaintances had been arrested or subjected to a jury trial. J.A. 217. Assuming the affidavit to be true, these responses were at least inaccurate. This is, however, the only inaccuracy established by the affidavit. The other alleged "lies" could not even be called inconsistencies.

██ For example, appellant contends that the juror lied during voir dire when she said she "never went" to the Fast Fare, J.A. 206. But he ignores the context in which the statement was made. The full colloquy follows: "Q: Do you have any knowledge about that particular incident [referring to the murder at the store]? A: I remember about when it happened because I was living near the area at the time and I noticed that the convenience store was boarded up. I didn't use it very

much because the Winn Dixie is right across the street, but I did notice it was boarded up and I asked why and someone said well, someone was murdered there. I noticed when it reopened. I never went there so that's all I know about it." *Id.*

When viewed in their full context, the juror's statements are perfectly consistent with the representations in the investigator's affidavit. The juror's comment that she "never went there" (referring to the Fast Fare) quite easily could have been a colloquial expression indicating that she had *rarely* patronized the Fast Fare, not that she had *never* patronized the store. Indeed, that the juror said during the same voir dire response that she "didn't use [the Fast Fare] very much" all but confirms that this colloquial usage was intended. If the comment was not intended in the colloquial sense, then it could just as easily have been intended to refer to the fact that the juror had never patronized the store after the crime, not that she had never been on or near the premises of the crime scene. In fact, the juror reported, during the same voir dire, that she saw the store boarded up after the crime and inquired about it; establishing both that she *did* at least go into the vicinity of the crime scene and that she was not trying to conceal this fact. *Id.* Given these eminently reasonable explanations of the supposed discrepancies between the juror's voir dire answers and the statements to the investigator, there is simply no basis upon which to conclude that the juror lied with respect to either her patronization of the Fast Fare or her visit to the crime scene.

██ Appellant also contends that the juror lied on voir dire when she said that she only had a vague prehearing knowl-

---

1. It is unclear whether both variations of the claim were raised in appellant's habeas petition in the district court, or whether both were raised in appellant's MARs filed in state court. We consider both herein. As to both, we determine that appellant has not made a substantial showing of a denial of a constitutional right.

edge of the case. However, the only relevant voir dire question that appears in the record was the following: "Q: ... I think that the evidence will show that this crime took place with a robbery and murder occurring at a convenience store on N. Person Street and in about the 800 block of North Person Street on March 7, 1987. Do you have any knowledge about that particular *incident?*" *Id.* (emphasis added). This question asked whether the juror had any knowledge of the robbery and murder, not whether the juror knew of any previous trial or of the death sentence that had been imposed on appellant. No other question on voir dire or in the jury questionnaire asked about any prehearing knowledge of appellant's death sentence. Furthermore, while the affidavit does states that "[t]his juror knew that Mr. Jones had previously received a death sentence," J.A. 351, the affidavit does not specify *when* the juror knew this. Given the affidavit's language, it could be that the juror had such knowledge *at the time that the investigator interviewed her.*[2]

■ Finally, the investigator's affidavit recounts the juror's belief "that the Bible mandates imposition of the death penalty in every case of first degree murder," and represents that, "when [the investigator] asked her whether she could imagine any first degree murder case in which the death penalty would not be appropriate, she could not, other than if the defendant grew up in a jungle with no contact with humanity." J.A. 351. This statement is fully consistent with the juror's voir dire responses, wherein she declared her support for the death penalty "when appropriate," J.A. 203, and offered as examples of circumstances where the death penalty

"might be in order," instances where "people were tortured or [for] certain brutal crimes," J.A. 204, and where she stated that she could fairly balance aggravating and mitigating factors, J.A. 205. It cannot be inferred from any statement in the affidavit that the juror could not disregard her personal feelings about the death penalty or apply the law as written, or that the juror lied when she stated that she could be a fair juror.

■ In sum, appellant has proffered evidence only that the juror responded inaccurately when she stated that she had no relatives who had been arrested or subjected to jury trials. It is far from clear that we look to state law to determine whether a challenge for cause would have been granted, but regardless, appellant cites no North Carolina statute or case allowing a challenge for cause based merely on the fact that the juror had relatives who had been arrested or subject to jury trials. Indeed, none of the jurors who answered "yes" to either of these questions was dismissed for cause on that fact alone.

To the extent that the federal standards governing challenges for cause are implicated, "[t]he category of challenges for cause is limited," and traditionally, a challenge for cause is granted only in the case of actual bias or implied bias (although a third category, inferred bias, might also be available). *See United States v. Torres,* 128 F.3d 38, 43 (2d Cir.1997). The mere fact that the juror's relatives had a history of arrests and jury trials certainly does not reach the high standard needed for the implication of bias. *See Person v. Miller,*

---

**2.** In the affidavit, in a separate paragraph from the discussion of the allegedly biased juror in question, the investigator reports that "[t]wo of the jurors we interviewed admitted that they knew at the time of Mr. Jones' 1991

sentencing hearing that he had previously received the death penalty." J.A. at 351. But it does not indicate that one of those two jurors is the one challenged in the petition and in this appeal.

854 F.2d 656, 664 (4th Cir.1988) (implied bias "is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances"). And, the fact that the juror had relatives who were subject to arrest and jury trials does not give rise to an inference that the juror was biased against the appellant; indeed, arguably, the more common-sense assumption is that a juror with this background would be biased in *favor* of the accused. *Cf. United States v. Ross*, 263 F.3d 844, 847 (8th Cir.2001) (stating that, where juror lied about being accused of felonies and convicted of misdemeanors on her questionnaire and during voir dire, "the juror's previous brushes with the law would create a stronger opposite inference—one that she might well be biased in favor of defendants in general"). Because even truthful answers to the questions on the questionnaire could not have formed the basis for a challenge for cause, appellant is not entitled to relief under the second part of the *McDonough* test.

### C.

█ Even apart from the *McDonough* test, appellant has not made a substantial showing that the juror in question was actually or impliedly biased. That the juror strongly supported the death penalty does not raise an inference that she could not follow the court's instructions properly. Nor does the fact that several members of the juror's family had abused drugs, which inspired in the juror a vehement opposition to illegal drug use, indicate that the juror was or would be biased against appellant. And the same is true with respect to the juror's limited contacts with law enforcement.

Misstatements on a jury questionnaire such as those here are troubling, but do not, standing alone, indicate juror bias. As the Supreme Court has instructed, "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556, 104 S.Ct. 845. Here, there is no evidence of motive, much less evidence of motive tending to raise questions as to the juror's impartiality.

Appellant's allegations are distinguishable from those made in such cases as *Williams (Michael) v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), *Fullwood v. Lee*, 290 F.3d 663 (4th Cir.2002), and *United States v. Colombo*, 869 F.2d 149 (2d Cir.1989). In *Williams*, the juror lied about her relationship with a prosecution witness (the father of her children) and the fact that one of the prosecutors once represented her in a legal matter; her explanation for her misrepresentation was questionable; and the prosecutor also remained silent. 529 U.S. at 441–42, 120 S.Ct. 1479. In *Fullwood*, the affidavit offered by the petitioner alleged that a juror was pressured by her husband to vote in favor of a death sentence, and that the pressure appeared to be effective. 290 F.3d at 676, 681. In *Colombo*, the juror had "claim[ed] to know that a locale at which the evidence will place the defendant is a 'hang out for gangsters,' and ... had deliberately responded falsely to a material question on voir dire precisely because she wanted to sit on the case," a circumstance in which, the Second Circuit stated, the juror "should be presumed not to be impartial." *United States v. Langford*, 990 F.2d 65, 69 (2d Cir.1993) (explaining the facts and holding of *Colombo* ). The troubling allegations presented in these cases are not

present here.[3]

## D.

In conclusion, appellant has not made a substantial showing of the denial of his constitutional right to an impartial jury. Issuance of a certificate of appealability on this ground, therefore, is unwarranted. *See* 28 U.S.C. § 2253(c)(2).

## III.

Appellant also argues that the State violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to turn over material, exculpatory information (in particular, the jail log and the jailor's identity), and in the alternative, that he was provided ineffective assistance of counsel, in violation of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), when his trial counsel failed to uncover this evidence. In rejecting appellant's second MAR, the state court held that both of these claims were procedurally defaulted because they "ha[d] previously been raised and addressed on the direct appeal and in the first motion for appropriate relief, or ... could have been raised therein and were not," and the appellant had "failed to demonstrate good cause for such failure or

shown actual prejudice...." J.A. 477. The state court also considered the merits of these claims, concluding that "even if these untimely claims and allegations were proven to be true as asserted, they do not show that the prosecution failed to disclose any information that would constitute exculpatory or materially favorable evidence.... The information is also insufficient to raise a reasonable doubt in the mind of a reasonable fact finder as to the correctness and appropriateness of the defendant's death sentence." *Id.* Thus, the state court concluded that the allegedly suppressed evidence was not material and that the suppression did not prejudice appellant.

Although it did not do so clearly, the state court appeared to apply the prejudice prong of both the *Brady* and *Strickland* tests in rejecting appellant's claims on the merits.[4] Therefore, appellant is not entitled to relief unless he can show that this determination was an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). If the state court's determination of the claim on the merits is so clearly reasonable that no "reasonable jurist[ ] could debate whether

---

**3.** Appellant also cites *United States v. Bynum,* 634 F.2d 768 (4th Cir.1980), in support of his contention of juror bias. *Bynum* is distinguishable on its facts, however. Circumstances concerning the racial composition of the jury and the race of the defendants triggered the concern of the court in that case. *Id.* at 771. These features simply are not present in the instant case. It also appears that the court in *Bynum* concluded that the juror's concealment impaired the rights of the defendants to "exercise intelligently a peremptory challenge," and that this, standing alone, entitled the defendants to a new trial. *Id.* Insofar as this reasoning was subsequently rejected by the Supreme Court in *McDonough,* 464 U.S. at 555, 104 S.Ct. 845, it is no longer good law. *See Zerka,* 49 F.3d at 1185

("The Supreme Court in *McDonough* explicitly rejected the argument that a plaintiff who is prevented from intelligently utilizing his peremptory challenges is entitled to a new trial, and it counseled against exactly this sort of endless second-guessing.").

**4.** In order to show prejudice under either *Brady* or *Strickland,* appellant must show that had there been no suppression of evidence or dereliction of counsel, there would have been "a reasonable probability that ... the proceeding's results would have been different." *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (*Strickland* ); *see Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (*Brady* ).

(or, for that matter, agree that) the petition should have been resolved in a different manner," *Slack*, 529 U.S. at 484, 120 S.Ct. 1595, then appellant is not entitled to a certificate of appealability.

The information from the jailor, who claimed to be experienced at dealing with individuals under the influence of drugs, J.A. 463, was as follows. First, based on observations that appellant moved slowly, looked tired, somewhat slurred his speech, and responded slowly to questions, the jailor formed the opinion that appellant looked to be "coming down from having been real high." J.A. 462. Second, having overheard appellant speaking to his grandfather on the telephone, the jailor believed that appellant was remorseful. J.A. 462–63.

 It is not unreasonable to conclude that had this evidence been available to appellant, there was no reasonable probability of a different outcome in any of the proceedings to which the appellant was subject.[5] First, it was only the jailor's belief that appellant appeared to be on drugs. The physical factors and characteristics cited by the jailor in support of her belief are equally consistent with appellant having committed a murder and robbery late in the evening; having been chased and apprehended by police officers; having spent all night and the morning under interrogation by police officers; having been awake for an extended period of time; and having been seen by the jailor early in the morning. *See* Appellant's Brief at 5–6 (setting forth facts); J.A. 462 (noting time that the jailor observed appellant).

Also, the evidence presented by the government that appellant was not suffering from a mental or emotional disturbance was significant and extensive. Not only did the officers who apprehended appellant testify that appellant showed no signs of impairment or drug use. But, during his taped confession on March 9, 1987, appellant made no mention of having been high on drugs, disoriented, or subject to any other significant mental or emotional disturbances while he planned and carried out the murder and robbery, which he admitted doing in order to pay off a debt. This was strong evidence that appellant was not suffering from any mental or emotional disturbance, as was other evidence presented by the prosecution and apparently believed by the jury. This combination of facts suggests, if anything, that the state court was correct, not simply reasonable, in concluding that appellant suffered no prejudice.

Second, the evidence the jailor presents regarding remorse is equally unconvincing. Appellant had recently been captured and interrogated throughout the morning. An individual might very well sound as if he were remorseful at this time due to a newfound appreciation for the consequences of his action, and the exhaustion caused by being awake and subject to interrogation for an extended period. Given that the appellant's own statement of remorse at the re-sentencing hearing was not sufficient for any juror to believe that he satisfied the statutory mitigating factors of remorse or sorrow, the jailor's recollections of the appellant's demeanor right after his capture and extensive interrogation could not have been considered more informative.

For the reasons stated, it clearly was not unreasonable for the state court to determine that there was no prejudice

---

5. To the extent that appellant contends that he would not have pled guilty had he been provided the information held by the jailor, this claim is foreclosed by *United States v. Ruiz*, ── U.S. ──, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002).

from the failure to disclose or uncover the evidence in question. Hence, federal habeas relief is unquestionably barred under 28 U.S.C. § 2254(d)(1).[6]

### CONCLUSION

Appellant, having failed to make a substantial showing of the violation of a constitutional right, is denied a certificate of appealability, and the appeal is dismissed.

*DISMISSED.*

6. Appellant also alleges that he was indicted by an unconstitutional "short form" indictment which, in violation of Supreme Court precedent, failed to allege each element of the crime of first degree murder and failed to allege any aggravating factors. Appellant recognizes that this claim is barred by our decision in *Hartman v. Lee*, 283 F.3d 190 (4th Cir.2002), and we reject the claim on the basis of this authority.