17-3515(L)
USA v. McCoy

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - -

August Term, 2019

(Argued: October 23, 2019

Final Briefs Submitted: January 3, 2020          Decided: April 22, 2021)

Docket Nos.  17-3515(L), 17-3516, 18-619, 18-625

_____

UNITED STATES OF AMERICA,

*Appellee*,

- v. -

EARL MCCOY, aka P, MATTHEW NIX, aka Meech, aka Mack, aka Mackey,

*Defendants-Appellants*[*].

_____

Before:  KEARSE, PARKER, and SULLIVAN, *Circuit Judges*.

Appeals in Nos. 17-3515 and 17-3516 from judgments of the United States

District Court for the Western District of New York, Elizabeth A. Wolford, *Judge*,

---

[*]     The Clerk of Court is instructed to amend the official caption to conform with the above.

convicting each defendant of Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a); Hobbs Act robbery and attempted robbery, in violation of 18 U.S.C. §§ 1951(a) and 2; brandishing firearms during and in relation to crimes of violence, to wit, the Hobbs Act conspiracy, Hobbs Act robbery, and Hobbs Act attempted robbery counts, in violation of 18 U.S.C. §§ 924(c)(1)(C)(i) and 2; conspiracy to distribute and to possess with intent to distribute marijuana and heroin, in violation of 18 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(D); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); convicting defendant McCoy of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; convicting defendant Nix of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(C)(i) and 2; and sentencing defendants McCoy and Nix principally to imprisonment for 135 years and 155 years, respectively.

In Nos. 18-619 and 18-625, defendants appeal from an order of the district court denying their postjudgment motions for reconsideration of the denial of their postverdict motions seeking a new trial on the ground that one of the jurors had given false responses to voir dire questions with regard to whether he had previously been

2

convicted of a felony. *See United States v. Nix*, No. 6:14-CR-06181, 2018 WL 1009282 (W.D.N.Y. Feb. 20, 2018); *United States v. Nix*, 275 F.Supp.3d 420 (W.D.N.Y. 2017).

On appeal, defendants contend principally (a) that they were entitled to a new trial on the ground that the juror's false voir dire responses violated their rights to be tried before a fair and impartial jury; (b) that their firearm-brandishing convictions should be reversed on the ground that none of their Hobbs Act offenses are predicate crimes of violence under 18 U.S.C. § 924(c); (c) that in light of *Rehaif v. United States*, 139 S. Ct. 2191 (2019), the trial court erred in failing to instruct the jury on an essential element of the § 922(g)(1) charges of being felons in possession of firearms; and (d) that they are entitled to reduction of their sentences under the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.

Finding merit in the contention that Hobbs Act conspiracy is not a § 924(c) crime of violence, *see United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019), we reverse defendants' § 924(c) convictions on Count 2 for brandishing firearms predicated on Hobbs Act conspiracy. Defendants' convictions on all other counts, as well as the denial of their motions for a new trial, are affirmed. The matter is remanded for resentencing, and for consideration by the district court of what relief, if any, may be appropriate under the First Step Act.

Affirmed in part, reversed in part, and remanded for further proceedings with regard to sentencing.

> ROBERT MARANGOLA, Assistant United States Attorney, Rochester, New York (James P, Kennedy, Jr., United States Attorney for the Western District of New York, Tiffany H. Lee, Assistant United States Attorney, Rochester, New York, on the brief), *for Appellee*.

> ROBERT W. WOOD, Rochester, New York, for *Defendant-Appellant Earl McCoy*.

> MICHAEL JOS. WITMER, Rochester, New York, *for Defendant-Appellant Matthew Nix*.

KEARSE, *Circuit Judge*:

Defendants Earl McCoy and Matthew Nix appeal in Nos. 17-3515 and 17-3516, respectively, from judgments entered in the United States District Court for the Western District of New York following a jury trial before Elizabeth A. Wolford, *Judge*, convicting each defendant on one count of Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a); one count of Hobbs Act robbery and two counts of Hobbs Act attempted robbery, in violation of 18 U.S.C. §§ 1951(a) and 2; four counts of brandishing firearms during and in relation to crimes of violence, to wit, the Hobbs Act conspiracy, Hobbs Act robbery, and Hobbs Act attempted robbery counts, in violation of 18 U.S.C. §§ 924(c)(1)(C)(i) and 2; one count of conspiracy to distribute

4

and to possess with intent to distribute marijuana and heroin, in violation of 18 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(D); and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); convicting McCoy on one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2; and convicting Nix on one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(C)(i) and 2. McCoy and Nix were sentenced principally to imprisonment for 135 years and 155 years, respectively.

In Nos. 18-619 and 18-625, respectively, McCoy and Nix appeal from an order of the district court denying their postjudgment motions for reconsideration of the denial of their postverdict motions seeking a new trial on the ground that one of the jurors had given false responses to voir dire questions with regard to whether he had previously been convicted of a felony.

On appeal, defendants contend principally (a) that they are entitled to a new trial on the ground that the juror's false voir dire responses violated their rights to be tried before a fair and impartial jury (*see* Part II.A. below); (b) that their firearm brandishing convictions should be reversed, and those counts dismissed, on the ground that none of their Hobbs Act offenses are predicate crimes of violence under

5

18 U.S.C. § 924(c) (*see* Part II.B. below); (c) that in light of *Rehaif v. United States*, 139 S. Ct. 2191 (2019), the trial court erred in failing to instruct the jury on an essential element of the § 922(g)(1) charges of being felons in possession of firearms (*see* Part II.C.1. below); and (d) that they are entitled to reduction of their sentences under the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 ("First Step Act") (*see* Part II.D. below).  Nix also makes brief sufficiency and instructional challenges.

Finding merit in the contention that Hobbs Act conspiracy is not a § 924(c) crime of violence, *see, e.g.*, *United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019), we reverse defendants' § 924(c) convictions on Count 2 for brandishing firearms predicated on Hobbs Act conspiracy. Defendants' convictions on all other counts, as well as the denial of their motions for a new trial, are affirmed.  The matter is remanded for defendants' resentencing, and for consideration by the district court of what relief, if any, may be appropriate under the First Step Act.

# I. BACKGROUND

The present prosecution focused on a series of home invasions in the Rochester, New York area in September and October 2014. The operative superseding indictment ("Indictment") alleged that McCoy and Nix, along with others including Clarence Lambert, Jecovious Barnes, Jessica Moscicki, and Gary Lambert, unlawfully conspired and attempted to rob other persons of commodities that had been shipped and transported in interstate and foreign commerce, such as diamonds, watches, United States currency, and narcotics, and conspired to traffic in the stolen narcotics. Clarence Lambert (or "Clarence") and Gary Lambert (or "Gary") are McCoy's younger brothers.

The government's evidence at the five-week trial of McCoy and Nix principally included testimony by Barnes, Moscicki, and Gary Lambert, who had entered into plea agreements with the government; testimony by victims of four home invasions; and cellular telephone records indicating that McCoy and Nix were in the immediate vicinity of the invasions, corroborating victim testimony about phone calls made during the robberies. Taken in the light most favorable to the government, the evidence included the following.

A. *Coconspirator Testimony as to Planning and Implementation*

Gary Lambert testified that in early 2014 he relocated from Brooklyn to Rochester to be with his brothers. He had known that McCoy and Clarence were engaged in the business of prostitution; when he arrived in Rochester, McCoy and Clarence also told him that "they was doing home invasion robberies, robbing people and selling drugs," and they recruited him to join their operation. (Trial Transcript ("Tr.") 2797.)

Gary testified that the robbery operation was led by McCoy and Nix and principally targeted persons who were believed to be drug dealers. McCoy, who was generally called "P," and Nix, who was generally called "Meech," had members of their crew, including Clarence, place tracking devices on vehicles driven by the persons targeted. McCoy and Nix were then able to use their phones to track the prospective victims' whereabouts (*see id*. at 2867) and tell Gary, Clarence, and the others whether the homes they were about to invade were unoccupied. Nix "was the one to tell us who had what, where to get it and how to get it." (*Id*. at 2853.)

Barnes, who was also known as "Bubbs" (*see* Tr. 1256-58), testified that he had committed some 10-20 "home invasion missions" with Nix (Tr. 1240) and that their targets generally were suspected drug dealers, victims unlikely to report the

robberies to the police. Nix would drive Barnes to the locations for the invasions; and although Nix never went inside the homes, he provided weapons and would communicate with Barnes by phone during the robberies. (*See, e.g., id*. at 1227 (Nix and McCoy supplied their crew with guns).) Nix would determine how the proceeds were distributed. (*See id*. at 1225-39.)

Moscicki testified that in the summer of 2014 she worked as a prostitute for McCoy, with whom she had a close, but non-romantic relationship; she was the girlfriend of McCoy's brother Clarence. Moscicki testified that, except for a 60-day period when she was in jail for shoplifting, she saw Clarence every day; she also saw McCoy about every two days. Much of the time she was living either with McCoy and his girlfriend "Anness" or with Clarence.

She assisted in the robbery operation by receiving on her cellphone messages from Nix to be relayed to Clarence, who did not have a working phone. On at least two occasions, she assisted more directly in invasions, either by knocking at the door of the targeted home to determine whether anyone was there or by driving a getaway car. She testified that she had been aware of the robbery operations conducted by McCoy and Nix, in which Clarence participated, because "Clarence would come back" to where they were staying "with a whole bunch of stuff, money,

9

drugs, electronics" (Tr. 514). Clarence told her he was participating in home invasions with McCoy, Nix, Barnes, and Gary (*see id*. at 515) and described the tracking devices they used on the cars of their prospective victims. Clarence said Nix told the crew which places to rob. Moscicki also heard Clarence discussing such invasions with Gary, Barnes, McCoy, and Nix.

Gary described the first home invasion in which he participated, a burglary where no one was at home; Nix told McCoy, Clarence, and Gary that the occupants had a lot of money and marijuana in the house; Nix and McCoy provided information from a tracking device. Gary and Clarence broke in; Gary then let McCoy in; and the three of them searched the house. (*See* Tr. 2868-71.) They found-- as Nix had predicted--substantial amounts of cash (totaling some $64,000) and marijuana (some 24 pounds). All of the proceeds of the robbery were handed over to McCoy and Nix, who divided most of it between themselves and gave the remainder--a total of $6,000 and one-and-a-half pounds of marijuana--to Gary and Clarence. (*See id*. at 2871-76.) Gary assisted in the sales of McCoy's share of the marijuana. (*See id*. at 2873-79.)

B. *Victims' Testimony and Results of the Invasions*

Victims of four home invasions described their losses and/or their treatment by the intruders. In an attempted robbery on September 15, two men with guns broke into a home on Hayward Avenue, demanding drugs and assaulting the adult occupants. No drugs were found. One of the would-be robbers was identified at trial as McCoy. Upon realizing that the residents were not drug dealers as defendants had believed, McCoy had made a phone call stating that "there was nothing in the house, that . . . there was just a woman and a man and a little kid." (Tr. 1082.)

In another attempted robbery, men broke into a home on Garson Avenue on September 18. They knocked one of the residents down and tied her up, brandished a gun at her mother, and asked "'Where the money, where the money, and the pills at'" (Tr. 1710). One of the victims identified Barnes as one of the intruders. Barnes testified that he had been driven to the Garson Avenue location by Nix and had participated in that attempted robbery with Clarence and McCoy. When no money or pills were found there, Barnes called Nix to report that they had found nothing of value.

11

On September 23, there was a burglary of a house on Maple Street where no one was at home. The victim testified that in 2014 he was a seller of marijuana and cocaine and kept a number of guns in the house. He described returning home at the end of his work day and finding that his drugs, money, and guns were gone. (*See* Tr. 1803, 1816.)

Moscicki testified that that Maple Street burglary was the first of defendants' invasions in which she had a direct role, ordered by McCoy to accompany him and Clarence. McCoy drove them to a spot near Maple Street, where they met up with Nix, who had brought Barnes. McCoy conferred with Nix, who said he had been monitoring the house to determine the owner's pattern of comings and goings. (*See* Tr. 519-26, 686.) McCoy instructed Moscicki to knock on the door of the targeted house to learn whether anyone was there. After Moscicki found the right house and no one answered her knock, she returned to McCoy's car; Nix then drove Barnes and Clarence into the driveway of the house. Later, Clarence told Moscicki they had found large quantities of marijuana and guns. (*See id*. at 597-98.)

Barnes testified that on that day, Nix had brought him to Maple Street; that McCoy and Clarence had arrived separately; and that McCoy and Nix told Barnes that the targeted home had heroin and cocaine hidden in the walls. Barnes

and Clarence, armed, broke into the house and found 10-12 large ziplock bags of marijuana, $7-10,000 in cash, and a half dozen guns. Barnes telephoned Nix and said, "We hit the jackpot" (Tr. 1321). Barnes and Clarence delivered everything they found to Nix. McCoy and Barnes subsequently "bought capsules to package the" marijuana for sale. (Tr. 1332.)

On October 7, there was an invasion of a house on Polo Place in the Rochester suburb of Greece, New York, occupied by a jewelry wholesaler and his wife, who were at home. The jeweler testified that he ran his business from his home. He testified that after the men broke into his house, he and his wife were threatened and repeatedly pistol-whipped. He estimated that the men stole $20,000 in cash, along with jewelry whose wholesale value was approximately $200,000. (*See* Tr. 1926-27.)

Barnes and Gary testified that they and Clarence were the ones who had conducted that robbery. Moscicki testified that several days earlier, she had gone to Polo Place with McCoy, Nix, Barnes, and Clarence, and had knocked at the jeweler's door to see whether anyone was at home. After the jeweler answered the knock (and tried his best to help Moscicki find the person or place she claimed to be seeking), the

13

crew regrouped and considered whether to do the robbery that day. Nix said no, which ended the discussion.

Barnes testified that they returned on October 7 to rob the house on Polo Place. Moscicki, driving a car belonging to McCoy's girlfriend, waited in the driveway; McCoy and Nix were parked nearby. Barnes and Clarence, along with Gary who had not been on the previous trip, broke into the house. Barnes and Gary testified that they threatened the couple with guns (and BB guns), and pistol-whipped the jeweler to get him to reveal the location of his money and open his safe. When they had collected all the cash, gold coins, watches, and jewelry they could find, they left and sped off in the car driven by Moscicki. They soon met up with McCoy and Nix, and Nix demanded that all of the loot be transferred to his vehicle.

As usual, McCoy and Nix were "the ones that did the splitting and division of" the loot (Tr. 2912). They divided most of it between themselves; they gave Barnes, Clarence, and Gary $3,300 each and allowed each to take a watch. (*See id*. at 2911-15.)

Defendants' operation began to unravel shortly thereafter when Clarence--despite admonitions by McCoy and Nix not to try to sell the watches in or near Rochester--tried a week later to pawn his chosen watch in Rochester.

14

C. *The Defense Case*

Neither McCoy nor Nix testified at trial. They called two witnesses from law enforcement who described possible inconsistencies between various witnesses' trial testimony and their respective prior statements. A Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives testified that Gary Lambert, in response to postarrest questioning about the Polo Place robbery, did not mention McCoy except to say that McCoy did not enter the building; and that Gary did not mention Nix at all. (*See* Tr. 3300-02.) And a Rochester police investigator testified that the Hayward Avenue victim who identified McCoy at trial as one of the intruders had given the Rochester police descriptions of the two intruders that did not match either Barnes or McCoy, and he had not picked McCoy's picture out of a photo array. (*See id*. at 3349-68.) However, on cross-examination, the investigator testified that, from a different photo array, the victim picked out McCoy as the intruder who had hit him in the face with a gun. (*See id*. at 3373-74).

D. *Jury Instructions and the Verdicts*

In charging the jury, the district judge segmented its deliberations, giving instructions first on Counts 1-8 and 11-12, leaving Counts 9 and 10, which charged Nix and McCoy, respectively, with firearm possession as a convicted felon, for later consideration.

As to the first group of counts to be considered, the court described the subject of each count of the Indictment, to wit: Count 1, conspiracy to commit Hobbs Act robbery; Count 2, brandishing firearms during and in relation to that conspiracy; Counts 3 and 5, the Hobbs Act attempted robberies at Hayward Avenue and Garson Avenue, respectively; Counts 4 and 6, brandishing firearms during and in relation to the Hobbs Act robbery attempts charged in Counts 3 and 5, respectively; Count 7, the narcotics possession-and-distribution conspiracy; Count 8, possession of firearms in furtherance of the Count 7 narcotics conspiracy; Count 11, the Hobbs Act robbery at Polo Place; and Count 12, brandishing firearms during and in relation to the Polo Place robbery.

With respect to Count 1, the court explained that conspiracy to commit a crime is itself a crime separate from and independent of the crime that is the objective of the conspiracy; that the government was required to prove beyond a

16

reasonable doubt that "the minds of at least two alleged conspirators met in an understanding way to meet the objectives of the conspiracy" (Tr. 3767); and that the objectives alleged in this case were

> the robbery of diamonds, watches and United States currency from a person engaged in the business of buying and selling diamonds, watches and other items shipped and transported in interstate and foreign commerce; and the robbery of controlled substances and United States currency from persons engaged in or believed to be engaged in the unlawful possession and distribution of controlled substances,

(*id*. at 3768-69). The court reiterated that in order to find a defendant guilty on Count 1, the jury must find that "the defendant under consideration knowingly and willfully became a participant in or member of the conspiracy." (Tr. 3769.)

With respect to Counts 2, 4, 6, and 12, charging defendants with brandishing firearms during a crime of violence (the "brandishing counts"), the court instructed that the government was required to prove that each defendant committed the predicate crime of violence, *i.e.*, the Hobbs Act offenses alleged in Counts 1, 3, 5, and 11, respectively; and it instructed that "Hobbs Act conspiracy, attempted Hobbs Act robbery and Hobbs Act robbery all constitute crimes of violence." (Tr. 3787.) However, the court instructed that if the jury found a given defendant not guilty on

a particular Hobbs Act count, the jury was not to consider against that defendant the brandishing count for which that Hobbs Act count was a predicate.

The court also instructed that, except with respect to the counts charging defendants with conspiracy or with firearm possession as a convicted felon, the Indictment charged each defendant both as a principal and as an aider and abettor, and that it was not necessary for the government to show that a defendant himself personally committed the crime with which he is charged in order for him to be found guilty. The court explained that a person who willfully causes another person to perform an act that is a crime against the United States is punishable as a principal; and that an aider and abetter, *i.e.*, "a person who did not commit the crime, but in some . . . way counseled, advised or in some way assisted the commission of the crime," "is just as guilty of that offense as if they had committed it themselves." (Tr. 3815.)

In addition, with respect to the substantive crimes alleged in Counts 2-6, 8, and 11-12, the court--over defendants' objections--gave a *Pinkerton* charge, *see Pinkerton v. United States*, 328 U.S. 640 (1946), instructing the jury that, as to "reasonabl[y] foreseeable acts" of any member of the conspiracy (Tr. 3804),

[i]f you find beyond a reasonable doubt that the defendant whose guilt you are considering was a member of the conspiracy charged in the indictment, then any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of the conspiracy may be considered against that defendant. This is so even if such acts were done and statements were made in a defendant's absence and without his knowledge

(*id*. at 3804-05).

The jury after deliberating for less than three hours, found McCoy and Nix guilty on Counts 1-8 and 11-12.

The court then turned to Counts 9 and 10, which charged Nix and McCoy, respectively, with being a felon in possession of firearms on September 23, 2014. It informed the jury that defendants and the government had "stipulated that prior to September 23, 2014," Nix and McCoy had each "been convicted of a crime punishable by imprisonment for a term exceeding one year." (Tr. 3873.) The court instructed that "[i]t is not necessary that the government prove that a defendant knew that the crime was punishable by imprisonment for more than one year." (*Id*. at 3874.) After brief deliberations, the jury returned verdicts of guilty on both counts.

Defendants thereafter moved for, *inter alia*, a new trial on the ground that they had recently discovered that one of the jurors was a previously convicted felon

and had failed to disclose his criminal history during jury selection. As discussed in Part II.A. below, the district court, following an evidentiary hearing at which the juror testified, denied the motion, *see United States v. Nix*, 275 F.Supp.3d 420 (W.D.N.Y. 2017) ("*Nix I*").

E. *Sentencing*

Defendants were sentenced in October 2017 under the advisory Sentencing Guidelines ("Guidelines"), pursuant to calculations they do not challenge on appeal. Each was sentenced principally to imprisonment totaling 30 years for Counts 1, 3, 5, 7, 11, and the felon-in-possession counts (Count 9 for Nix, Count 10 for McCoy), to be followed by 25-year terms for each of Counts 2, 4, 6, and 12. Nix, whose prior record included a § 924(c) conviction, also received a mandatory minimum consecutive sentence of 25 years on Count 8; McCoy, whose record did not include a prior § 924(c) conviction, received a mandatory minimum consecutive sentence of 5 years on Count 8. Thus, Nix's total term of imprisonment was 155 years; McCoy's was 135 years.

20

F.  *The Present Appeals*

Defendants promptly appealed the judgments of conviction.  Thereafter they moved in the district court for reconsideration of the denial of their motions for a new trial on the ground of juror misconduct.  Following the denial of reconsideration, *see United States v. Nix*, No. 6:14-CR-06181, 2018 WL 1009282 (W.D.N.Y. Feb. 20, 2018) ("*Nix II*"), each defendant appealed that denial, and their four appeals were consolidated.  Defendants filed their opening briefs, principally pursuing the contention that they are entitled to a new trial because of juror misconduct, and contending that their convictions on the brandishing counts should be reversed on the ground that the Hobbs Act conspiracy and robbery offenses of which they were convicted are not crimes of violence.

Thereafter, prior to the oral argument of their appeals, defendants sought and received permission to file supplemental briefs to contend that, in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), Hobbs Act conspiracy is not a crime of violence within the meaning of 18 U.S.C. § 924(c), and to contend that they are entitled to reduction of their sentences under the First Step Act. Following oral argument of the appeals, defendants sought and received permission to file additional supplemental briefs in light of the Supreme Court's decision in *Rehaif*

21

*v. United States*, 139 S. Ct. 2191 (2019), contending that the district court erred in failing to instruct the jury that, in order to establish their guilt under § 922(g)(1) as felons in possession of firearms, the government was required to prove that, when they possessed the firearms, they knew they were convicted felons.

## II. DISCUSSION

On these appeals, defendants contend principally (1) that the juror's misconduct violated their Sixth Amendment rights to an impartial jury and entitled them to a new trial on all viable counts; (2) that none of the Hobbs Act offenses of which they are convicted qualifies as a crime of violence under 18 U.S.C. § 924(c), and thus the § 924(c) firearm-brandishing counts (Counts 2, 4, 6, and 12) predicated on Hobbs Act offenses are not viable and should be dismissed; and (3) that their respective Counts 9 and 10 felon-in-possession-of-firearm convictions should be vacated in light of *Rehaif* because the government did not prove that, when they possessed the firearms, they knew they were convicted felons. They also argue, alternatively, that they are entitled to a reduction of their sentences under the First

Step Act; and they make cursory challenges to various aspects of the trial proceedings.

Several of defendants' contentions are raised for the first time on these appeals. An error that has not been preserved by timely objection in the district court may be reviewed on appeal if it is "[a] plain error that affects substantial rights." Fed. R. Crim. P. 52(b). Under plain-error review,

> "before an appellate court can correct an error not raised [in the district court], there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"

*United States v. Groysman*, 766 F.3d 147, 155 (2d Cir. 2014) ("*Groysman*") (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (which was quoting *United States v. Olano*, 507 U.S. 725, 732 (1993))).

The burden is on the appellant to meet all four criteria. *See, e.g., United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004); *Groysman*, 766 F.3d at 155; *United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020). If all four are met, we have discretion to grant relief despite the defendants' failure to preserve the issue in the

23

district court for normal appellate review. *See*, *e.g.*, *Johnson*, 520 U.S. at 467; *Olano*, 507 U.S. at 732.

For the reasons that follow, we find merit only in defendants' contention that Hobbs Act conspiracy is not a crime of violence within the meaning of § 924(c) and that their convictions on Count 2 must therefore be reversed and the case remanded for resentencing.

A. *The Motion for a New Trial Based on Juror Misconduct*

About a month after the jury's final verdicts were returned, and prior to the imposition of sentences, McCoy and Nix moved pursuant to Fed. R. Crim. P. 33 for a new trial, stating that defense counsel had learned that one of the jurors had been convicted of two felonies and had failed to disclose his criminal history during jury selection. The juror was eventually correctly identified as Juror Number 3, and was referred to by the district court--as he will be here--as either "J.B." or "Juror No. 3" in light of general court "rule[s] that the names and personal information concerning jurors and prospective jurors should not be publicly disclosed," *Nix I*, 275 F.Supp.3d at 424 n.2.

24

1. *The Juror Questionnaire and Voir Dire Proceedings*

Prior to any oral voir dire at defendants' trial, a questionnaire had been mailed by the court to prospective jurors.  Question 6 asked:  "Have you ever been convicted, either by your guilty or nolo contendere plea or by a court or jury trial, of a state or federal crime for which punishment could have been more than one year in prison?" J.B. answered this question by checking "No." *Nix I,* 275 F.Supp.3d at 445 & n.4.

In addition, during the oral voir dire--to the extent "relevant to these post-verdict motions," *id*. at 426 n.6--the court addressed the following questions to a panel of 36 prospective jurors who had been placed under oath, including J.B.:

(1) "Has anyone ever been the victim of a home robbery?" ([Tr.] 97);

(2) "Has anyone ever served on a jury before?" (*id*. at 205);

(3) "Has anyone ever been a defendant in a criminal case?" (*id*. at 214);

(4) "Has anyone ever visited a jail or correctional facility other than in connection with . . . your educational curriculum" (*id*. at 229);

(5) "Has anyone had anyone close to them, other than what we already discussed, . . . anyone close to them convicted of a crime?" (*id*. at 239).

*Nix I*, 275 F.Supp.3d at 426. Juror No. 3 "did not respond" to any of these questions. *Id*. at 425-26.

> Similarly, Juror No. 3 did not offer any information in response to the Court's "catch-all" questions asked toward the end of *voir dire*: whether there was "anything in fairness to both sides that you think we should know that we haven't covered already" ([Tr.] 221), and "[i]s there anything that you think we should know that we haven't covered up to this point?" (*id*. at 257).

*Nix I*, 275 F.Supp.3d at 426.

In support of their new-trial motion, defendants produced public records showing, *inter alia*, that Juror No. 3 had previously pleaded guilty and been convicted of two felonies, *i.e.*, possession of stolen property in 1988 and burglary in 1989; that his son had been convicted of a crime; and that Juror No. 3 had been the victim of a home burglary. Defendants contended that they were entitled to a new trial even absent a showing of bias, because convicted felons are statutorily ineligible to serve as jurors in federal court, *see* 28 U.S.C. § 1865(b)(5), and, in any event, that Juror No. 3's nondisclosures demonstrated bias.

The district court ordered an evidentiary hearing ("Hearing") at which Juror No. 3 testified, represented by appointed counsel. (*See* New Trial Hearing

26

Transcript, June 12 and 14, 2017 ("H.Tr.").) The government granted Juror No. 3 immunity with regard to any nonperjurious testimony he would give at the Hearing.

2. *The Hearing*

In response to questioning by the court at the Hearing, Juror No. 3 acknowledged that he had answered Question 6 on the preliminary questionnaire incorrectly. He testified that he had not been aware that his answer was incorrect. Age 46 when defendants' trial proceedings began, Juror No. 3 testified that he had responded that he had no prior felony convictions because he assumed that the question referred only to crimes committed after the age of 21; that he was 17 or 18 at the time he was convicted; and that he believed convictions entered when he was younger than 21 had been expunged from his record. He also testified that he had not believed that his 1989 conviction for burglary required an affirmative answer because, although the sentence was two-to-four years, he "was offered six months in shock camp" and that is how he satisfied the sentence (H.Tr. 72-75); he testified that he did not "know that [he] actually had a felony" (*id*. at 83).

In addition, while conceding that the district court had not stated that its voir dire questions applied only to one's experiences over the age of 21, Juror No. 3

27

testified that he had also believed the five questions quoted above did not apply to crimes, convictions, or experiences prior to the age of 21. Juror No. 3 also testified that at the time of trial, he did not know his son had been convicted of a crime; he had not spoken to his son for several years prior to that time and learned of the conviction only a month before the Hearing. Juror No. 3 conceded that his failure to respond to the above five questions posed to the panel as whole was incorrect. (*See id*. at 83-85, 89-92, 168-69, 172-75; *see also id*. at 97-98 (stating that he had answered questions on previous calls for jury duty in the same way, on the assumption that they concerned events and experiences after the age of 21).)

When questioned further about his own prior record, Juror No. 3 also initially claimed that he had been falsely accused of both of the felonies of which he was convicted, and he claimed to have at best a hazy memory of events that had occurred 28 years earlier, when he was 17 or 18. He said he did not remember how many times he had been convicted of crimes punishable by more than one year in prison. And while he recalled being convicted of breaking into a clothing store when he was 17 or 18, and serving six months in "shock camp" for that crime, he did not remember such aspects as the location of the shock camp, the names of all of his codefendants, whether the prosecution was state or federal, or whether he had

28

pleaded guilty or gone through a trial. (*See id*. at 72-76.) However, on the second day of the Hearing, Juror No. 3 was confronted with his signed confessions in both the burglary case and the stolen property case, and he admitted that he had been involved in both. (*See id*. at 179-84, 222-25, 231.)

When asked whether he had wanted to serve as a juror in this case, Juror No. 3 three times responded "Yes" (H.Tr. 93, 96); when asked why, he stated it was because he was picked, and he believed it was his right and his duty (*see id*. at 93). He stated that he is able to vote, and he did not know that having a prior felony conviction disqualified him from serving as a juror. (*See id*. at 82.) However, when later again asked whether he had wanted to serve as a juror in this case, Juror No. 3 answered "No" (*id*. at 97, 235, 242, 243). He testified he had answered yes to that question previously because he was "confused about the question" (*id*. at 242). He said that he had not been happy to receive a summons for jury duty; that his false or inaccurate answers to the voir dire questions were not given out of any desire to serve on the jury (*see id*. at 94, 233-34); and that if he had known that by telling the court about his past experiences with the law he would have been excused, he would have done so (*see id*. at 97, 240, 243).

Juror No. 3 answered "No" to all questions as to whether his prior experiences with the law had caused him to be biased for or against the defendants or for or against the government, or had given him reason to credit the testimony of cooperating witnesses against the defendants.

3. *The District Court's Ruling*

In a thorough opinion, *Nix I*, 275 F.Supp.3d 420, the district court denied defendants' motion for a new trial based on juror misconduct. It rejected their contention that Juror No. 3's felony conviction, absent any showing of bias, automatically warranted the granting of a new trial based on the statutory disqualification of convicted felons from serving on federal juries, *see* 28 U.S.C. § 1865(b)(5). The court noted that "[t]his argument has been rejected by every circuit court to have considered the issue." *Nix I*, 275 F.Supp.3d at 436 n.17; *see, e.g., United States v. Boney*, 977 F.2d 624, 633 (D.C. Cir. 1992) (the "Sixth Amendment right to an impartial jury . . . does not require an absolute bar on felon-jurors"); *see also United States v. Langford*, 990 F.2d 65, 69 (2d Cir. 1993) ("*Langford*") (rejecting the argument that a juror's intentionally false response during voir dire is an automatic ground for a new trial).

30

Rather, pointing to "the Sixth Amendment's guarantee to a trial by an impartial jury," and noting that "'[a]n impartial jury is one in which all of its members, not just most of them, are free of interest and bias,'" *Nix I*, 275 F.Supp.3d at 424 (quoting *United States v. Parse*, 789 F.3d 83, 111 (2d Cir. 2015) ("*Parse*"))--but that a defendant is "'entitled to a fair trial but not a perfect one, for there are no perfect trials,'" *Nix I*, 275 F.Supp.3d at 424 (quoting *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) ("*McDonough*"))--the district court noted that

> the Second Circuit has adopted a two-part test that a defendant must establish in order to justify granting a new trial based upon incorrect responses by a juror during *voir dire*: (1) the defendant must first demonstrate that the juror "failed to answer *honestly* a material question on *voir dire*"; and (2) the defendant *then must also demonstrate* that "a correct response would have provided a valid basis for a challenge for cause"--in other words, the juror would have been excused *for bias* based on the correct *voir dire* response. *Langford*, 990 F.2d at 68-69 (quoting *McDonough*, 464 U.S. at 556-58 . . . ).

*Nix I*, 275 F.Supp.3d at 437 (emphases ours). The district court stated that under the first part of this test

> the Court must assess whether Juror No. 3 deliberately lied or consciously deceived the Court, as opposed to providing inaccurate responses as a result of a mistake, misunderstanding or embarrassment. *See McDonough*, 464 U.S. at 555, 104 S.Ct. 845; *Langford*, 990 F.2d at 69-70 (finding *where a juror's intentionally false statements at voir dire were caused by embarrassment, and there was no*

31

*evidence "that she gave false answers because of any desire to sit on the jury,"* it was proper for the district court to deny the defendant's motion for a new trial . . . .

*Nix I*, 275 F.Supp.3d at 437-38 (emphasis ours).

The court here found that Juror No. 3 had made some intentionally false statements at voir dire; but it found that they were in no way motivated by a desire to sit on the jury:

The Court does not doubt that Juror No. 3's inaccurate testimony regarding his criminal record was due, in part, to the age of the convictions. However, *given Juror No. 3's false testimony during the evidentiary hearing about his culpability for the two felony convictions, the Court does not credit Juror No. 3's explanation that he was confused by the voir dire questions or thought that the questions applied to criminal convictions only after the age of 21.* Based on Juror No. 3's continued refusal to disclose the full extent of his criminal history during the evidentiary hearing--until faced with documentary evidence of the same--the Court concludes that Juror No. 3 failed to respond truthfully to the juror questionnaire and the Court's voir dire questions as they pertained to both his criminal convictions and his exposure to a jail.

*However, this finding does not mean that the Court concludes that Juror No. 3 provided false information about his criminal record in an effort to intentionally deceive the Court so as to be selected to serve on the jury.* Here, *Juror No. 3 did not lie "for the purpose of securing a seat on the jury," Parse*, 789 F.3d at 111, nor can his lies be characterized as "premeditated and deliberate" so as to hide his true identity and ensure his selection on the jury, id. at 92-93.

*Nix I*, 275 F.Supp.3d at 447-48 (emphases ours).

The court found that the very fact that Juror No. 3 continued to lie about his criminal history at the evidentiary Hearing, after having been granted immunity for nonperjurious Hearing testimony, indicated he had a persisting motive for refusing to be honest about his criminal past at the Hearing until confronted with documentary evidence. The court was persuaded that "his motives had nothing to do with securing a seat on this jury." *Id*. at 448. While the court was "not persuaded that Juror No. 3 misunderstood the scope of the questions as only applying to convictions at the age of 21 and older, when responding to either this Court or other courts in the past," *id.*, it found that Juror No. 3's motivation for the inaccurate responses was not nefarious, but

> rather, . . . more likely originates from the simple fact that, at 47 years old, Juror No. 3 would prefer to shut out any recollection of his criminal history--the most recent of which (if [a] domestic violence incident from 1999 is included) was about 20 years ago, and most of which occurred when he was a teenager.

*Id*. Thus, although the court found "that Juror No. 3 testified falsely about certain information during the Hearing that was conducted on June 12 and 14, 2017," it

> *reject[ed] the notion that Juror No. 3 intentionally deceived the Court during voir dire as to his criminal history so as to gain a seat on the jury*. Although Juror No. 3's voir dire answers regarding his criminal history were inaccurate, *the Court cannot conclude that they rise to*

33

*the level of intentional falsehood necessary to satisfy the first prong of the* McDonough *test*.

*Id*. (emphases added).

The court further saw no evidence from which to find or infer that Juror No. 3 had had any bias, whether actual, implied, or inferred. As to actual bias, *i.e.*, "'the existence of a state of mind that leads to an inference that the person will not act with entire impartiality,'" *Nix I*, 275 F.Supp.3d at 449 (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) ("*Torres*"), *cert. denied*, 523 U.S. 1065 (1998)), the court found that

> [t]his was plainly not a case of Juror No. 3 wanting to hide information about his past *to make himself more marketable as a juror*, like the juror in *Parse*. Early in the *voir dire*, Juror No. 3 expressed reservations about serving because of his job responsibilities. (Dkt. 328 at 41). During the jury selection, Juror No. 3 was frustrated with the Court about the length of the proceedings (*see* Dkt. 359 at 238-39), and in fact, once selected to serve, he left the courtroom as the Court was still informing the jurors about some housekeeping matters (*see* Dkt. 327 at 32).

*Nix I*, 275 F.Supp.3d at 450 (emphasis added). Further, there was

> *no evidence that Juror No. 3 knew that disclosure of his criminal record would have disqualified him from jury service.* The Court believes that if Juror No. 3 had known this information, his reluctance to be honest about his criminal history would have likely been overcome by a desire to avoid jury service. *In sum, the Court finds that there is no evidence of actual bias on the part of Juror No. 3, in favor*

*of or against either the Government or Defendants*. Even evaluating the facts in the light most favorable to Defendants (which is not the standard), no actual bias has been shown in this case. *There is just no proof that Juror No. 3 intentionally lied to smuggle his way onto the jury*.

*Id*. at 451 (emphases added).

Nor did the court find any basis to find "implied bias"--a concept that is "reserved for 'extreme situations'" warranting a conclusive presumption of bias as a matter of law. *Id*. (quoting *United States v. Greer*, 285 F.3d 158, 172 (2d Cir. 2002) ("*Greer*")); *see, e.g., Torres*, 128 F.3d at 45. Implied bias generally "'deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself.'" *Nix I*, 275 F.Supp.3d at 451 (quoting *Greer*, 285 F.3d at 172 (other internal quotation marks omitted)). The court found that Juror No. 3 had no relationships with any of the parties, victims, witnesses, or attorneys; and it saw "no [other] fact in the record which, had it been elicited during jury selection, would have required the Court to automatically assume bias on the part of Juror No. 3 or that Juror No. 3 was prejudiced against Defendants or in favor of the Government." *Nix I*, 275 F.Supp.3d at 451.

Finally, the district court found no evidence from which it should "infer" bias. It noted that

35

"[b]ias may be inferred when a juror discloses a fact that *bespeaks a risk* of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, *but not so great as to make mandatory a presumption of bias*."

*Id*. at 453 (quoting *Torres*, 128 F.3d at 47 (emphases ours)); *see, e.g., Greer*, 285 F.3d at 172 (findings as to inferred bias lie "within the discretion of the trial court"). After reviewing all of the evidence and defense contentions before it, the court concluded that there was no evidence to support defendants' contention that Juror No. 3 had "had bad experiences with law enforcement" or that his experiences would cause him to be biased against defendants; and it found no evidence to support their contention that because Juror No. 3 had pleaded guilty in a case in which he had codefendants, he would be predisposed to credit the views of cooperating witnesses and thus be biased against defendants. *Id*. (internal quotation marks omitted). The court also deemed the mere existence of Juror No. 3's criminal history--nearly three decades old--too remote to warrant inferring bias.

The district court further found that defendants' own jury selection strategy strongly suggested the absence of reason to infer that Juror No. 3 was biased against defendants based on his criminal record: When the government moved, during jury selection, to dismiss a prospective juror ("T.P.") for cause upon learning

36

that T.P. had prior felony convictions that he had not disclosed, defendants vigorously objected to T.P.'s dismissal. *Nix I*, 275 F.Supp.3d at 426-27, 429; *see also id.* at 453 ("McCoy even admits that it would have been the Government who challenged Juror No. 3 for cause if his criminal history had been revealed.").

In sum, the court concluded that defendants also failed to meet the second prong of the *McDonough* test because it concluded that

> [t]here is no actual bias because there is no finding of partiality based upon either the juror's own admission or the judge's evaluation of the juror's demeanor and credibility following voir dire questioning as to bias,

*id*. at 453 (internal quotation marks and emphasis omitted); that

> there is no implied bias because the disclosed fact does not establish the kind of relationship between the juror and the parties or issues in the case that mandates the juror's excusal for cause,

*id*. (internal quotation marks and emphasis omitted); and that

> the record does not provide a basis to infer bias. Even if the first prong of the *McDonough* test was satisfied, *there is no evidence of extreme deceit* (such as in *Parse*) that would support the showing required under *McDonough*'s second prong. Put simply, the Court does not believe that the deliberateness of [Juror No. 3's] particular lies evidenced partiality . . . ; and *even if Juror No. 3 did intentionally attempt to deceive the Court*, the deliberateness of his lies is not sufficiently intentional or premeditated so as to, in and of themselves, establish bias under the second prong,

*Nix I*, 275 F.Supp.3d at 454 (internal quotation marks omitted (emphases added)).

### 4. *Abuse-of-Discretion Review*

A district court's denial of a Rule 33 motion for a new trial is reviewable for abuse of discretion. *See, e.g.*, *Parse*, 789 F.3d at 110. A court abuses its discretion if (1) it takes an erroneous view of the law, (2) its decision rests on a clearly erroneous finding of fact, or (3) its decision "cannot be located within the range of permissible decisions." *Id*. We see no such flaws in the denial at issue here.

First, we see no error in the district court's ruling that the statutory disqualification of felons from serving on the jury, raised for the first time after trial, did not provide an automatic basis for a new trial. Under the Jury Selection and Service Act of 1968 ("Jury Selection Act"), 28 U.S.C. § 1861 *et seq.*, the court, in determining "whether a person is unqualified for . . . jury service" in federal court, *id*. § 1865(a), shall deem ineligible a person who "has been convicted in a State or Federal court of record of[] a crime punishable by imprisonment for more than one year and his civil rights have not been restored," *id*. § 1865(b)(5). In a criminal case, a defendant who contends that there has been a substantial failure to comply with the Jury Selection Act's provisions may move to stay or dismiss the proceedings "*before the voir*

38

*dire examination begins*, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, *whichever is earlier*." *Id*. § 1867(a) (emphases added). Without precluding such other remedies as may be available for challenges based on prohibited discrimination, the statute provides that "[t]he *procedures described by this section shall be the exclusive means* by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title." *Id*. § 1867(e) (emphasis added).

In light of the procedural limitations imposed by §§ 1867(a) and (e), this Circuit and most others have concluded that the mere fact that the jury included a person whom § 1865 made ineligible to serve as a juror is not a ground for a new trial when the objection is not raised until after voir dire has begun. *See*, *e.g.*, *United States v. Silverman*, 449 F.2d 1341, 1343-44 (2d Cir. 1971) ("*Silverman*") ("the statute clearly requires that a challenge on this ground be made at or before the v[oi]r dire"), *cert. denied*, 405 U.S. 918 (1972); *United States v. Paradies*, 98 F.3d 1266, 1277-78 (11th Cir. 1996), *as amended* (Nov. 6, 1996) ("once voir dire begins, Jury Selection Act challenges are barred, even where the grounds for the challenge are discovered only later"), *cert. denied*, 522 U.S. 1014 (1997); *United States v. Candelaria-Silva*, 166 F.3d 19, 31-32 (1st Cir.

1999) (same), *cert. denied*, 529 U.S. 1055 (2000); *United States v. Jasper*, 523 F.2d 395, 398 (10th Cir. 1975) ("a motion" under § 1865 must "be filed prior to the beginning of the voir dire examination"); *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 209 (5th Cir. 1992) ("section 1867 precludes any statutory challenges to irregularities in jury selection that are not made before voir dire"); *but see United States v. Webster*, 639 F.2d 174, 180 (4th Cir. 1981), *modified*, 669 F.2d 185 (4th Cir. 1982) ("Any objection to the composition of the jury was waived, however, because defendants first sought to raise it at a time subsequent *both* to the beginning of the voir dire examination and to a point seven days after they could have discovered the grounds for the challenge by the exercise of due diligence." (emphasis added)), *cert. denied*, 456 U.S. 935 (1982).

In *Silverman*, which concerned a juror who was disqualified under § 1865(b)(2) because she was unable to read or write the English language, we concluded that "[s]ince defendant failed to raise any objection to [the disqualified juror's] serving on the jury until after his conviction, his attack on that conviction cannot be founded on [her] disqualification under the statute." 449 F.2d at 1344. We ruled that after trial, "[t]he inclusion in the panel of a disqualified juror does not require reversal of a conviction unless there is a showing of actual prejudice." *Id*.

40

Defendants have proffered no basis for deviating from this principle or from our view of the timing restrictions imposed by the statute. Accordingly, their contention that, because Juror No. 3 would have been excluded from the jury if his statutorily disqualifying prior conviction had been known, they are entitled to a new trial without consideration of whether Juror No. 3 was biased or whether his being on the jury caused them actual prejudice, was correctly rejected by the district court.

The district court instead properly turned to the question of whether the presence of Juror No. 3 on the jury violated defendants' rights under the Sixth Amendment to trial before a jury that was unbiased. The court correctly laid out the relevant Sixth Amendment principles, describing standards indicated by the Supreme Court in *McDonough* and applied in past cases in this Court, *see*, *e.g.*, *Parse*, 789 F.3d 83; *Greer*, 285 F.3d 158; *Torres*, 128 F.3d 38; *Langford*, 990 F.2d 65. As reflected in the above description of the district court's decision, the court properly recognized that the initial question to be explored is whether the juror's nondisclosure was deliberate or inadvertent; and it recognized that the ensuing determination as to the existence of bias--whether actual, or implied as a matter of law, or permissibly inferred--may well be affected both by whether the nondisclosure was deliberate and, if it was, by

41

the juror's motivation to conceal the truth. Such determinations required assessments of the juror's credibility.

As was well within its prerogative as finder of fact, the court found Juror No. 3 to have been truthful in some parts of his testimony while not in others. The court here relied on, *inter alia*, its observation of Juror No. 3's "facial expressions, demeanor, and intonation"; it noted that Juror No. 3 appeared to be unsophisticated and had demonstrable "problems understanding the questions and expressing himself clearly," *Nix I*, 275 F.Supp.3d at 440; and it drew permissible inferences both with respect to the likely truthfulness of Juror No. 3's explanations for his inaccuracy about, for example, the life experiences of his relatives, and with respect to the likely motivation for Juror No. 3's false statements at the Hearing and on voir dire about his own criminal history. Although defendants view Juror No. 3's statements as "dubious" or "not ring[ing] true" (McCoy brief on appeal at 69, 70), the court explored the possible sources of bias on the part of Juror No. 3 and found none. The record does not support a conclusion that the court erred in its assessments of Juror No. 3's credibility or in its ultimate conclusion that his false statements as to his criminal history were not motivated by any desire to serve as a juror in the present case.

Accordingly, we see no error of law or clearly erroneous finding of fact, and no other basis for overturning the district court's ruling that the record does not suggest that Juror No. 3 had any bias against defendants or in favor of the government, and its consequent denial of defendants' juror-misconduct-based motion for a new trial.

5. *Defendants' Postjudgment Motion for Reconsideration*

Nor is there merit in defendants' appeals from the denial of their postjudgment motion for reconsideration of the denial of their Rule 33 new-trial motion. A motion for reargument, while proper for calling to the court's attention controlling decisions or data the court has overlooked, is inappropriate for the presentation of new facts or contentions, or for an attempt to reargue old ones. *See*, *e.g.*, *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). The denial of a motion for reconsideration is reviewable only for abuse of discretion. *See*, *e.g.*, *United States v. Bayless*, 201 F.3d 116, 131 (2d Cir.), *cert. denied*, 120 S. Ct. 1571 (2000).

The district court denied defendants' motion for reargument in part because it was based on supposedly new evidence that was not new; and it was unaccompanied by a showing of diligence as to why the evidence had not been

sought or discovered earlier. *See Nix II*, 2018 WL 1009282, at *3-*4. The court also found that what defendants proffered was not sufficiently significant to influence the decision of the Rule 33 motion.

What defendants sought to introduce as new evidence was "actual evidence" that Juror No. 3 had been "arrested" for burglary in 1989. *Nix II*, 2018 WL 1009282, at *5. The record is clear, however, that "[i]n rendering its decision [in *Nix I*], the Court was already aware that there was some evidence that Juror No. 3 was arrested for a home burglary in May of 1989," *Nix II*, 2018 WL 1009282, at *5; *see, e.g.*, *Nix I*, 275 F.Supp.3d at 453 n.30 ("*There is some evidence in the record that Juror No. 3 may have been arrested for burglarizing a home in May of 1989 (when he was 19 years old). . . . Juror No. 3 had no recollection of this alleged incident, and there is no evidence that he was convicted of this crime.*" (emphasis added)).

Thus, defendants' "new" evidence concerned an arrest that had in fact been discussed at the Hearing. And defendants' desire to renew a challenge to Juror No. 3's claimed lack of memory--of an arrest not shown to have led to a conviction--hardly seems likely to shed light on the material issue of whether Juror No. 3's failure to disclose any part of his criminal history was motivated by a desire to be seated as a juror for the trial in this case.

44

As to that material issue, the court reaffirmed its *Nix I* assessment of Juror No. 3's credibility and motivation:

> Having observed Juror No. 3 firsthand during the course of the trial and the two-day evidentiary hearing, this Court rejects the notion that Juror No. 3 lied during *voir dire* so as to secure a spot on the jury.

*Nix II*, 2018 WL 1009282, at *5. The district court correctly stated that "Defendants are not entitled to reconsideration merely because they disagree with the outcome of the Rule 33 Denial Order and the Court's determination as to Juror No. 3's alleged bias . . . ." *Id*.

We see nothing in the record to suggest that the denial of defendants' request for reconsideration of their juror-misconduct-based motion for a new trial constituted an abuse of the district court's discretion.

B. *Which Hobbs Act Offenses Are Crimes of Violence Within the Meaning of § 924(c)*

Section 924(c), as pertinent to defendants' convictions on the brandishing counts (Counts 2, 4, 6, and 12), prescribes enhanced punishment for any person who brandished a firearm "during and in relation to any crime of violence." 18 U.S.C. § 924(c)(1)(A). Although prior to the Supreme Court's decision in *Davis*, 139 S. Ct.

2319, § 924(c) also contained an alternative definition of crime of violence in subpart (c)(3)(B) (*see* Part II.B.1. below), for purposes of § 924(c) a "crime of violence" is now defined only as a felony that "has as an element the *use, attempted use, or threatened use of physical force* against the person or property of another," *id*. § 924(c)(3)(A) (emphases added).

The crimes on which defendants' brandishing-count convictions are predicated are offenses proscribed by the Hobbs Act (or "Act"), 18 U.S.C. § 1951.  The Act in pertinent part, prohibits a person from

> affect[ing] commerce . . . *by robbery . . . or attempt[ing] or conspir[ing] to do so*, or commit[ting] *or threaten[ing] physical violence* to any person or property in furtherance of a plan or purpose to do anything in violation of this section.

18 U.S.C. § 1951(a) (emphases added).  Hobbs Act "robbery" is defined to

> mean[] the unlawful *taking or obtaining of personal property from the person or in the presence of another*, against his will, *by means of actual or threatened force, or violence, or fear of injury, immediate or future*, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

*Id*. § 1951(b)(1) (emphases added).

McCoy and Nix, convicted of three types of Hobbs Act offenses--robbery (Count 11), conspiracy to commit robbery (Count 1), and attempted robbery (Counts 3

46

and 5)--contend that none of the Hobbs Act crimes are crime of violence. We agree only with respect to Hobbs Act conspiracy.

1. *Hobbs Act Conspiracy*

Defendants' convictions on the brandishing charge in Count 2 of the Indictment were predicated on their convictions of the Hobbs Act conspiracy alleged in Count 1. It is now established that Hobbs Act conspiracy is not a crime of violence within the meaning of § 924(c). *See United States v. Barrett*, 937 F.3d 126 (2d Cir. 2019) ("*Barrett II*").

In *United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018) ("*Barrett I*"), *vacated and remanded for further consideration*, 139 S. Ct. 2274 (2019), we had affirmed the defendant's convictions on several § 924(c) counts that were predicated on Hobbs Act robbery (*see* Part II.B.3 below), and had affirmed one § 924(c) conviction that was predicated on Hobbs Act conspiracy. We had affirmed the latter § 924(c) conviction based in part on § 924(c)(3)(B) because Hobbs Act conspiracy (an offense that is complete without performance of any overt act *see, e.g., United States v. Maldonado-Rivera*, 922 F.2d 934, 983 (2d Cir. 1990), *cert. denied*, 501 U.S. 1211 (1991); *United States*

47

*v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987), *cert. denied*, 486 U.S. 1022 (1988)), poses a risk of the use of force, *see Barrett I*, 903 F.3d at 175-77.

While the present appeals were pending, the Supreme Court decided *United States v. Davis*, --- U.S. ----, 139 S. Ct. 2319 (2019), ruling that § 924(c)(3)(B), in defining crime of violence in terms of a "risk" that physical force would be used, was unconstitutionally vague, *see* 139 S. Ct. at 2323-24. As "a vague law is no law at all," *id*. at 2323, we concluded in *Barrett II* that *Davis* "precludes" a conclusion "that [a] Hobbs Act robbery conspiracy crime qualifies as a § 924(c) crime of violence," 937 F.3d at 127.

Accordingly, we conclude, and the government agrees, that defendants' convictions on Count 2 must be reversed, and the case remanded for resentencing.

2. *Hobbs Act Robbery*

Defendants' contention that Hobbs Act robbery is also not a crime of violence within the meaning of § 924(c), however, is contrary to the law of this Circuit. *See Barrett II*, 937 F.3d at 128; *United States v. Hill*, 890 F.3d 51 (2d Cir. 2018) ("*Hill*"), *cert. denied*, 139 S. Ct. 844 (2019). In *Hill*, we employed the "categorical approach" prescribed by *Taylor v. United States*, 495 U.S. 575 (1990), which requires

48

that where Congress has defined a violent felony as a crime that has the use or threat of force "as an element," the courts must determine whether a given offense is a crime of violence by focusing categorically on the offense's statutory definition, *i.e.*, the intrinsic elements of the offense, rather than on the defendant's particular underlying conduct, *id*. at 600-01. We stated that

> [a]s relevant here, the categorical approach requires us to consider the minimum conduct necessary for a conviction of the predicate offense (in this case, a Hobbs Act robbery), and then to consider whether such conduct amounts to a crime of violence under § 924(c)(3)(A).

*Hill*, 890 F.3d at 56.

We noted that subpart (3)(A) of § 924(c) defines crime of violence as a felony that "'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'" *Hill*, 890 F.3d at 54 (quoting § 924(c)(3)(A)). And we noted that the Hobbs Act penalizes a person who affects commerce "'*by robbery* . . . or attempts or conspires so to do, *or commits or threatens physical violence* to any person or property in furtherance of a plan or purpose to do anything in violation of this section,'" and that the Act defines robbery in part as "'the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, *by means of actual or threatened force, or violence, or fear of*

49

*injury, immediate or future, to his person or property*,'" *id*. 890 F.3d at 54-55 (quoting 19 U.S.C. §§ 1951(a) and (b)(1) (emphases ours)). Comparing these statutes, we concluded that "Hobbs Act robbery 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another,' 18 U.S.C. § 924(c)(3)(A)," and thus is a crime of violence within the meaning of that provision. *Hill*, 890 F.3d at 60; *see also id*. at 60 & n.7 (noting that "all of the circuits to have addressed the issue" have "h[e]ld that Hobbs Act robbery 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another'" (citing cases)).

*Hill*'s conclusion that Hobbs Act robbery is a crime of violence within the meaning of § 924(c)(3)(A) was not eroded by the Supreme Court's subsequent ruling in *Davis* that the alternative crime-of-violence definition in § 924(c)(3)(B) was unconstitutionally vague. Rather, after *Davis*, a § 924(c) conviction based on a crime of violence is valid only under § 924(c)(3)(A). *See, e.g.*, *Barrett II*, 937 F.3d at 128 (noting that Hobbs Act robbery is "a crime of violence under § 924(c)(3)(A) applying the traditional, elements only, categorical approach not at issue in *Davis*"). Accordingly, we "affirm[ed] Barrett's convictions on" the § 924(c) counts for which the

50

predicate crime of violence was "*substantive* Hobbs Act robbery." *Id*. (emphasis in original).

Although McCoy and Nix contend that Hobbs Act robbery is not categorically a crime of violence even under § 924(c)(3)(A), arguing that property could be obtained by threatening to withhold care from a person in need or to "poison" a person, and that such means do not constitute physical force (*e.g.*, McCoy brief on appeal at 82), we expressly rejected just such an argument in *Hill*. We noted that such hypothetical possibilities as the withholding of vital care, which have never been the basis of a Hobbs Act charge, are ineffective to deflect the stated thrust of the statute; and that "physical force 'encompasses even its indirect application,' as when a battery is committed by administering a poison." *Hill*, 890 F.3d at 59 (quoting *United States v. Castleman*, 572 U.S. 157, 170 (2014)).

In sum, defendants' contention that Hobbs Act robbery is not a crime of violence within the meaning of § 924(c)(3)(A) is foreclosed by *Hill* and *Barrett II*.

3. *Hobbs Act Attempted Robbery*

Defendants' contention that their firearm-brandishing convictions on Counts 4 and 6 should be reversed on the ground that the offense of Hobbs Act

51

attempted robbery (Counts 3 and 5) does not constitute a crime of violence--a contention not raised in the district court, and thus reviewable only under plain-error analysis--is also unpersuasive. We address this issue as to the nature of the Act's prohibition of attempted robbery, which is one of first impression in this Circuit, again using the categorical approach.

As set out above, the surviving § 924(c) definition of "crime of violence" expressly includes a felony that "has as an element the . . . *attempted* use . . . of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A) (emphasis added). It is a fundamental principle of statutory interpretation that, "absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Sekhar v. United States*, 570 U.S. 729, 732 (2013) (internal quotation marks omitted). The definition of "attempt" both in federal law and in the Model Penal Code had long been settled by 1986, when the operative language of § 924(c)(3)(A) was adopted. *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 104(a)(2), 100 Stat. 449, 456-57 (1986) (first defining "crime of violence" to include "attempted use . . . of physical force"); *United States v. Farhane*, 634 F.3d 127, 146 (2d Cir.) ("*Farhane*") ("This court effectively adopted the Model Code's formulation of attempt in *United States v. Stallworth*, 543 F.2d 1038, 1040-41 (2d Cir. 1976)."), *cert.*

*denied*, 565 U.S. 1088 (2011). Accordingly, when Congress used "attempted use" in § 924(c) without providing a different definition for the phrase, it adopted the concept of "attempt" existing under federal law.

"Under federal law, '[a] person is guilty of an attempt to commit a crime if he or she (1) had the intent to commit the crime, and (2) engaged in conduct amounting to a "substantial step" towards the commission of the crime.'" *United States v. Thrower*, 914 F.3d 770, 776 (2d Cir.) ("*Thrower*") (quoting *United States v. Martinez*, 775 F.2d 31, 35 (2d Cir. 1985)), *cert. denied*, 140 S. Ct. 305 (2019). This means that, for substantive crimes of violence that include the use of physical force as an element, defendants also commit crimes of violence when commission of those crimes is attempted--because such attempts necessarily require (a) an intent to complete the substantive crime (including an intent to use physical force) and (b) a substantial step towards completing the crime (which logically means a substantial step towards completion of all of that crime's elements, including the use of physical force). *See United States v. Taylor*, 979 F.3d 203, 209 (4th Cir. 2020) ("*Taylor*"). Because we held in *Hill* that Hobbs Act robbery categorically constitutes a crime of violence, *see* 890 F.3d at 53, it follows as a matter of logic that an "attempt[]" to commit Hobbs Act

robbery--which the statute also expressly prohibits, *see* 18 U.S.C. § 1951(a)--categorically qualifies as a crime of violence.

McCoy and Nix raise two principal arguments for why this should not be so. First, they contend that Hobbs Act attempted robbery is not a crime of violence because it is possible for a defendant to "take a substantial step towards commission of an offense without engaging in a violent act." (McCoy first supplemental brief on appeal at 16). But while it is true that a substantial step towards a completed Hobbs Act robbery need not itself involve the "use . . . of physical force" within the meaning of § 924(c)(3)(A), *see, e.g.*, *United States v. Jackson*, 560 F.2d 112, 120 (2d Cir.) ("*Jackson*") ("reconnoiter[ing] the place contemplated for the commission of the crime and possess[ing] the paraphernalia to be employed in the commission of the crime" constituted substantial steps towards a bank robbery in violation of 18 U.S.C. § 2113(a)), *cert. denied*, 434 U.S. 914 (1977); *United States v. Gonzalez*, 441 F. App'x 31, 36 (2d Cir. 2011) (applying *Jackson* to Hobbs Act attempted robbery), *cert. denied*, 565 U.S. 1218 (2012), that is of no moment, since the substantive Hobbs Act robbery towards which that substantial step leads necessarily would involve the "use of physical force," if completed. To be guilty of Hobbs Act attempted robbery, a defendant must necessarily (1) intend to commit all of the elements of a substantive

54

robbery, including the use of physical force, and (2) take a substantial step towards committing the substantive robbery, which logically includes taking a substantial step towards completing all of its elements, including the use of force. Accordingly, even if a defendant's substantial step does not itself involve the use of physical force, a defendant must necessarily intend to use physical force and take a substantial step towards using physical force, which constitutes "attempted . . . use of physical force" within the meaning of § 924(c)(3)(A). *Accord United States v. Walker*, 990 F.3d 316, 325 (3d Cir. 2021); *United States v. Dominguez*, 954 F.3d 1251, 1262 (9th Cir. 2020), *petition for cert. filed*, No. 20-1000 (U.S. Jan. 26, 2021); *United States v. Ingram*, 947 F.3d 1021, 1026 (7th Cir.), *cert. denied*, 141 S. Ct. 323 (2020); *United States v. St. Hubert*, 909 F.3d 335, 351-52 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 1394 (2019). *Cf. United States v. Hendricks*, 921 F.3d 320, 328-29 & n.40 (2d Cir. 2019) (holding that attempted bank robbery by intimidation in violation of § 2113(a) is a crime of violence because intimidation "means that the defendant did or said something that would make an ordinary reasonable person fear bodily harm" (internal quotation marks omitted)), *cert. denied*, 140 S. Ct. 870 (2020).

McCoy and Nix next argue that Hobbs Act attempted robbery does not categorically constitute a crime of violence because substantive Hobbs Act robbery

55

need not always involve the actual use of force; rather, the statute defines "robbery" as "the unlawful taking . . . of personal property . . . by means of actual *or threatened* force." 18 U.S.C. § 1951(b)(1) (emphasis added). Based on this definition of "robbery," as the Fourth Circuit recently observed, Hobbs Act attempted robbery could also theoretically include "attempt[s] to *threaten* force," which would appear not to constitute an "attempt to *use* force" as required by § 924(c)(3)(A). *Taylor*, 979 F.3d at 209 (emphases in original).

However, even though it is theoretically possible that a defendant could be charged with Hobbs Act attempted robbery under such an attempt-to-threaten theory, we have made clear that "to show a predicate conviction is not a crime of violence 'requires more than the application of legal imagination to [the] . . . statute's language'"; rather "there must be 'a realistic probability, not a theoretical possibility,' that the statute at issue could be applied to conduct that does not constitute a crime of violence." *Hill*, 890 F.3d at 56 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). To show such a "realistic probability," a defendant "'must at least point to his own case or other cases in which the . . . courts did in fact apply the statute in the . . . manner for which he argues.'" *Hill*, 890 F.3d at 56 (quoting *Duenas-Alvarez*, 549 U.S. at 193).

McCoy and Nix have failed to make such a showing here. They point to no case in which a defendant has been convicted of Hobbs Act attempted robbery premised on an *attempted* "threat[]" to use force, and we are aware of none. And for good reason: For purposes of the federal crime of attempt, a "substantial step" means conduct (a) that is "planned to culminate in the commission of the *substantive* crime being attempted," *Farhane*, 634 F.3d at 147 (internal quotation marks omitted (emphasis ours)), and (b) that "is strongly corroborative of the criminal intent of the accused," *United States v. Davis*, 8 F.3d 923, 927 (2d Cir. 1993). It is difficult even to imagine a scenario in which a defendant could be engaged in conduct that would "culminate" in a robbery and that would be "strongly corroborative of" his intent to commit that robbery, but where it would also be clear that he only "attempt[ed]" to "threaten[]," and neither used nor even actually "threatened" the use of force.

Indeed, in *Thrower* we made a similar observation when considering whether the New York crime of attempted third-degree robbery involves the "attempted use . . . of physical force" within the meaning of 18 U.S.C. § 924(e)(2)(B), since New York law defines robbery similarly to Hobbs Act robbery, *see* N.Y.Penal Law § 160.0 (defining "[r]obbery" as "us[ing] or threaten[ing] the immediate use of physical force" "in the course of committing a larceny"). We observed that "[t]hough

57

Thrower posits that a defendant might be convicted of attempted robbery in New York *for an attempt to threaten* to use physical force--*as distinct from an attempt to use physical force or a threat to use* physical force--he fails to 'at least point to his own case or other cases in which the state courts did in fact apply the statute in the . . . manner for which he argues.'" *Thrower*, 914 F.3d at 777 (quoting *Duenas-Alvarez*, 549 U.S. at 193 (emphases ours)).

In sum, we hold that Hobbs Act attempted robbery qualifies as a crime of violence under § 924(c) because an attempt to commit Hobbs Act robbery using force necessarily involves the "attempted use . . . of force" under § 924(c)(3)(A), and because, even though a conviction for an inchoate attempt to threaten is theoretically possible, McCoy and Nix have not shown that there is a "realistic probability" that the statute will be applied in such a manner, *Duenas-Alvarez*, 549 U.S. at 193.

4. *Liability for Aiding-and-Abetting*

Finally, McCoy and Nix contend--for the first time on these appeals--that their § 924(c) firearm-brandishing convictions on Counts 4, 6, and 12 should be reversed for lack of a proper predicate because their convictions of the corresponding substantive Hobbs Act offenses (Counts 3 and 5 (attempted robbery) and Count 11

58

(robbery)) were based on an aiding-and-abetting theory of liability. Given evidence that they normally sat in nearby cars while their brothers and/or friends entered the targeted homes, threatened the victims, and stole or attempted to steal the victims' property, McCoy and Nix contend that aiding-and-abetting a substantive Hobbs Act offense is not a crime of violence. This contention need not detain us long.

Section 2 of Title 18 provides in part that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). For the aiding-and-abetting theory of liability to apply, the underlying federal crime must have been committed by someone other than the defendant; and the defendant himself must either have acted, or have failed to act, with the specific intent of aiding the commission of that underlying crime. *See*, *e.g.*, *Rosemond v. United States*, 572 U.S. 65, 77 (2014); *United States v. Smith*, 198 F.3d 377, 382-83 (2d Cir. 1999) ("*Smith*"), *cert. denied*, 531 U.S. 864 (2000). Section 2(a) makes an aider and abetter as guilty of the underlying crime as the person who committed it.

There is no culpable aiding and abetting without an underlying crime committed by some other person; and aiding and abetting itself is not the predicate crime for firearm brandishing under § 924(c). The aiding-and-abetting concept

59

describes the role of the defendant that makes him liable for the underlying offense. "[W]hen a person is charged with aiding and abetting the commission of a substantive offense, the 'crime charged' is . . . the substantive offense itself." *Smith*, 198 F.3d at 383 (other internal quotation marks omitted); *see, e.g., United States v. Richardson*, 906 F.3d 417, 426 (6th Cir. 2018) ("*Richardson I*") ("There is no distinction between aiding and abetting the commission of a crime and committing the principal offense. *Aiding and abetting is simply an alternative theory of liability; it is not a distinct substantive crime.*" (internal quotation marks omitted) (emphasis ours)), *vacated and remanded on other grounds, Richardson v. United States*, 139 S. Ct. 2713 (2019) ("*Richardson II*").

The crime charged in a prosecution for aiding and abetting a Hobbs Act robbery is thus Hobbs Act robbery. *Accord In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016) ("Because an aider and abettor is responsible for the acts of the principal as a matter of law, an aider and abettor of a Hobbs Act robbery necessarily commits all the elements of a principal Hobbs Act robbery."); *United States v. Deiter*, 890 F.3d 1203, 1215-16 (10th Cir.) (courts should look to "the underlying statute of conviction, rather than § 2, to decide whether [§ 924(c)(3)(A)] is satisfied"), *cert. denied*, 139 S. Ct. 647 (2018).

If the underlying offense is a crime of violence, it is a predicate for § 924(c) liability; if the defendant aided and abetted that underlying offense, he is guilty of the underlying offense. As we have concluded above, Hobbs Act robbery and Hobbs Act attempted robbery are crimes of violence within the meaning of § 924(c). As McCoy and Nix--either directly or as aiders and abetters--were found guilty of those crimes of violence, they were convicted of crimes that are proper predicates for § 924(c) liability. Their § 924(c) convictions, based on their guilt as aiders and abetters of the violent crimes of Hobbs Act robbery and attempted robbery, are not error, much less plain error.

C. *Instructional and Sufficiency Challenges*

Defendants also make several other challenges to their convictions, principally contending that, in light of the Supreme Court's decision in *Rehaif,* their § 922(g)(1) convictions as felons in possession of firearms should be vacated because the district court failed to instruct the jury that the government was required to prove that when they possessed the firearms, they knew their status as felons. Nix also contends that the evidence was insufficient to support his convictions on Counts 3,

61

4, and 7, and that the court erred in giving the jury a *Pinkerton* instruction. We reject all of these challenges.

       1.  *The* Rehaif *Challenges*

On Counts 9 and 10, respectively, Nix and McCoy were convicted of having been in possession of firearms on September 23, 2014, in violation of 18 U.S.C. § 922(g), which makes firearm possession unlawful by "any person . . . who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year."  18 U.S.C. § 922(g)(1) (the "felon-in-possession" subparagraph).  Anyone who "knowingly violates" any of the nine subparagraphs of § 922(g), including subparagraph (g)(1), is subject to imprisonment for up to 10 years.  *Id*. § 924(a)(2).

While the present appeals were pending, the Supreme Court in *Rehaif*, which involved a defendant convicted under a different § 922(g) subparagraph, ruled that "in prosecutions under § 922(g) and § 924(a)(2), the Government must prove that a defendant knows of his status as a person barred from possessing a firearm," 139 S. Ct. at 2195; *see id*. at 2194 (the government must show not only that "the defendant knew he possessed a firearm" but "also that he knew he had the relevant status when he possessed it").

In charging the jury in the present case, the district court instructed that each defendant had "stipulated" with the government "that prior to September 23, 2014," he had in fact "been convicted of a crime punishable by imprisonment for a term exceeding one year" (Tr. 3873); but it did not instruct that the jury must find that, when they possessed firearms on that date defendants knew they had been convicted of a crime that was punishable by imprisonment for more than one year. Defendants contend that they are thus entitled to have their convictions on Counts 9 and 10 vacated and the matter remanded for further proceedings. We disagree. As defendants neither requested an instruction as to their knowledge of their felony status nor objected to the instructions that were given, we review these challenges only for plain error, and we conclude that defendants do not meet that standard.

In light of *Rehaif*, it was error not to instruct that the government was required to prove defendants' knowledge of their status as convicted felons at the time of their firearm possession; and that error is plain, *see, e.g.*, *Henderson v. United States*, 568 U.S. 266, 279 (2013) ("it is enough that an error be 'plain' at the time of appellate consideration for [t]he second part of the [four-part] *Olano* test [to be] satisfied" (other internal quotation marks omitted)); *United States v. Balde*, 943 F.3d 73, 97 (2d Cir. 2019). Thus, the first two prongs of plain-error analysis have been met.

63

It is also arguable that the third prong of the plain-error test--an error affecting substantial rights--may have been met. The Supreme Court in *Rehaif*, while noting that, as to the relevant status element of § 922(g), the requisite "knowledge can be inferred from circumstantial evidence," 139 S. Ct. at 2198 (internal quotation marks omitted), also suggested that an inference of knowledge as to felony status with respect to the felon-in-possession subparagraph of § 922(g) might not be available if the "person . . . was convicted of a prior crime but sentenced only to probation," and "d[id] not know that the crime [wa]s *punishable* by imprisonment for a term exceeding one year," *id.* (emphasis in original).

In the present case, while McCoy and Nix stipulated that they had previously been convicted of crimes punishable by imprisonment for a term exceeding one year, their stipulations neither included acknowledgement that they knew those crimes were punishable to that extent nor specified the length of the sentences actually imposed on them. And the government has not called to our attention any trial evidence from which the jury, if properly instructed, could have found beyond a reasonable doubt that they had such knowledge.

In a case raising post-*Rehaif* issues similar to those here, we "decline[d] to decide whether a properly-instructed jury would have found that [the defendant]

64

was aware of his membership in § 922(g)(1)'s class," *United States v. Miller*, 954 F.3d 551, 559 (2d Cir. 2020) ("*Miller*"), and we instead proceeded directly to "the fourth prong of plain-error review, which examines whether not reversing would seriously affect[] the fairness, integrity or public reputation of judicial proceedings and which does not necessarily confine us to the *trial* record," *id.* (internal quotation marks and footnote omitted) (emphasis ours). In *Miller* we found reliable information in the presentence report ("PSR") prepared on the defendant, which, *inter alia*, described his criminal record. As a defendant's criminal history is an essential factor in the district court's required calculation of the sentence recommended for him by the Guidelines, the contents of the PSR will have been subjected to close scrutiny by both sides. The PSR for the defendant at issue in *Miller* showed that he had prior felony convictions for which he received "a total effective sentence of ten years' imprisonment, with execution suspended after three years, which remove[d] any doubt that [he] was aware of his membership in § 922(g)(1)'s class." *Id*. at 560.

Accordingly, we concluded that the *Miller* trial court's failure to instruct the jury on the element of whether the defendant knew he was a convicted felon "did not rise to the level of reversible plain error" because it does no disservice to the judicial system to hold that a person who was sentenced to and served a prison term

65

of more than one year must have been aware of both the extent of his sentence and the length of time he spent in prison. *Id*. We have reached the same result in other post-*Rehaif* cases in which the district court records revealed that the defendant had received, and had served, a prison sentence exceeding one year. *See, e.g., United States v. Sandford*, 814 F. App'x 649, 652-53 (2d Cir. 2020); *United States v. Smith*, 814 F. App'x 634, 635-36 (2d Cir. 2020); *United States v. Goolsby*, 820 F. App'x 47, 50 (2d Cir. 2020); *United States v. Johnson*, 816 F. App'x 604, 607-08 (2d Cir. 2020); *United States v. Frye*, 826 F. App'x 19, 23-24 (2d Cir. 2020); *United States v. Feaster*, 833 F. App'x 494, 497 (2d Cir. 2020).

The district court record in the present case includes PSRs with similar details--unobjected to by McCoy or Nix--as to the sentences actually imposed on them for their prior felony convictions and the amounts of prison time they served for those convictions. McCoy, in 2001, was convicted in New York State court, following his plea of guilty, on two felony counts of criminal possession of controlled substances and was sentenced to a prison term of 54 months to nine years; as a result he was imprisoned for nearly six years. Nix, in 2008, was convicted in federal court, following his plea of guilty, of possession of narcotics with intent to distribute and possession of a firearm in furtherance of the drug offense; he was sentenced to 24

66

months' imprisonment for each offense, to be served consecutively. As a result, Nix spent some four years in prison.

On this record, we conclude that there can be no reasonable doubt that each of these defendants knew he had been convicted of a crime punishable by imprisonment for a term exceeding one year. McCoy and Nix thus have not shown that the trial court's failure to instruct the jury that it must find that a defendant had such knowledge seriously affected the fairness, integrity, or public reputation of judicial proceedings. The unobjected-to error provides no basis for vacating the convictions on Counts 9 and 10.

2. *Nix's Sufficiency Challenges*

Nix contends that the evidence at trial was insufficient to convict him on Count 7 of the Indictment, which charged the narcotics distribution conspiracy, and on Counts 3 and 4, which concerned the attempted robbery and use of firearms at Hayward Avenue. In considering a challenge to the sufficiency of the evidence to support a conviction, we view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessments of

67

witness credibility and the weight of the evidence.  *See, e.g., United States v. Lyle*, 919 F.3d 716, 737 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 846 (2020); *United States v. O'Brien*, 926 F.3d 57, 79 (2d Cir. 2019); *United States v. Praddy*, 725 F.3d 147, 152 (2d Cir. 2013). With the evidence at trial viewed in that light, and considered as a whole rather than piecemeal, *see, e.g., United States v. Podlog*, 35 F.3d 699, 705 (2d Cir. 1994), *cert. denied*, 513 U.S. 1135 (1995); *United States v. Brown*, 776 F.2d 397, 403 (2d Cir. 1985), *cert. denied*, 475 U.S. 1141 (1986), a conviction will be upheld so long as, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

In a prosecution for conspiracy to possess with intent to distribute a prohibited substance, the element of intent to distribute--as contrasted with an intent to possess only for personal use--"may be inferred from the volume of drugs with which defendant was associated or that was in his actual or constructive possession." *United States v. Anderson*, 747 F.3d 51, 62 n.8 (2d Cir. 2014), *cert. denied*, 574 U.S. 850 (2014); *see, e.g., United States v. Brockman*, 924 F.3d 988, 993 (8th Cir. 2019) (finding that the district court did not clearly err in determining that "eight ounces [of marijuana] exceeded a user quantity"); *United States v. Martinez*, 964 F.3d 1329, 1334 (11th Cir. 2020) ("A pound, whether it's cocaine, heroin, marijuana, or methamphetamine, is

68

more than personal users typically buy.").  And we have noted quantity is not always dispositive: "[A]ny amount of drugs, however small, will support a conviction when there is additional evidence of intent to distribute." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

Nix, in challenging the sufficiency of the evidence to support his Count 7 conviction of conspiracy to distribute narcotics, argues that there was no direct testimony that he engaged in narcotics distribution, and that Barnes testified that he never observed Nix engaging in such distribution. (*See* Nix brief on appeal at 55-56.) Given the record before us, and the fact that Count 7 charged conspiracy, rather than actual distribution, this challenge is meritless.

First, there was abundant proof of the existence of a robbery conspiracy whose principal members were McCoy, Barnes, Clarence and Gary Lambert, and Nix--who was called "Meech" (Tr. 1223).  The evidence included, as described in Part I.A. above, the testimony of Barnes who admitted having engaged in 10-20 home invasions with Nix; and through Nix, Barnes met, and participated in home invasions with, Clarence, Gary, and McCoy.  (*See* Tr. 1240, 1230-31.)  Although Nix himself did not enter the invaded homes, he selected the persons to be robbed, conducted preliminary surveillance of targeted premises, planned the invasions, provided guns,

69

and gave the men who would enter information as to what to expect and where to search (*see, e.g., id*. at 1239 (Barnes: "Meech would tell me the location and take me there and I would go in the house with somebody else")). And while his associates were inside, Nix would wait for them in the car "either down the street or around the corner" (*id*. at 1236); the men who had entered would phone Nix to report whether they were finding the expected trove of money and/or drugs (*see id*. at 1236-37). When the men who had entered emerged with stolen property, they turned it over to Nix who, with McCoy, decided how it would be divided. (*See, e.g., id*. at 1237-40, 2912.)

Second, there was ample evidence that a principal goal of the conspiracy was to rob drug dealers. Barnes testified that in all but one instance, the residents of the invaded homes were persons Nix believed to be drug dealers. (*See* Tr. 1228.) And it was understood among the coconspirators that Nix and McCoy intended to sell the narcotics obtained in those robberies. (*See, e.g., id*. at 1238 (as to drugs obtained in such a robbery, "Meech would take it and sell it and give me what he felt like I should get off those"); *id*. ("[Meech] would sell the drugs and give me money, bring me money back off the drugs").) Barnes testified that drug dealers were targeted

70

precisely because they would have "[m]oney, drugs, drugs that we could sell." (*Id*. at 1228.)

For example, Barnes testified that for the September 23 burglary, Nix drove him to Maple Street and identified the intended house; Nix then phoned McCoy and Clarence. After McCoy and Clarence arrived and got into Nix's car, Nix and McCoy told Barnes and Clarence what kind of drugs they would find in the house and said that drugs could be found hidden in the walls. (*See* Tr. 1312-15.) Barnes testified that the "plan . . . if [they] got drugs from inside that house," was that "Meech and P was going to sell" the drugs and give Barnes and Clarence some of the proceeds. (*Id*. at 1316.)

According to plan, Barnes and Clarence, armed with guns, entered the Maple Street house and, as predicted by Nix, found cash and drugs. Barnes phoned Nix from the house and said, "We hit the jackpot"; Nix told him to "Get everything and I'll be there . . . I'm coming." (Tr. 1321.) What they found in the Maple Street house included 10-12 "large" ziplock bags--an estimated eight inches by six or eight inches--"full of weed." (*Id*. 1322-33.) Nix, McCoy, Barnes, and Clarence then went to Barnes's then-house, and Nix--who had taken possession of the $7-10,000 in cash that Barnes and Clarence had found--gave Barnes and Clarence each $1,000. "[Nix] took

71

all of the drugs" (Tr. 1332); and McCoy and Barnes subsequently "bought capsules to package the" marijuana "[s]o we could sell it" (*id*.).

The jury could also infer that the amounts of narcotics stolen by the conspirators and appropriated by Nix as his share--especially given the large number of home invasions done by defendants and their crew seeking to obtain drugs, *see*, *e.g.*, *id.* at 2871-76 (Gary describing an earlier burglary that yielded 24 pounds of marijuana, of which Nix's share was more than 11 pounds)--were inconsistent with possession merely for Nix's personal use.

In sum, the evidence was ample to allow the jury to find that Nix was part of a conspiracy whose express goal was to rob drug dealers of narcotics in quantities sufficient to allow members of the conspiracy to be drug dealers themselves.

In challenging his conviction on Counts 3 and 4 with respect to the Hayward Avenue attempted robbery, Nix argues that the cellphone evidence that he was near that location at the time of that event was "dispute[d]," and that "mere presence at the scene of a crime, even when coupled with knowledge that at that moment a crime is being committed is insufficient to establish the defendant's

72

participation in criminal activity." (Nix brief on appeal at 56, 55 (internal quotation marks omitted).) This argument is meritless as well.

As discussed above, coconspirators at trial described the usual operations of the conspiracy, in which Nix organized and planned the home invasions and remained nearby while they took place, and the men who actually entered the homes would telephone Nix after entering and inform him of what they found. One of the armed men who broke into the Hayward Avenue home, expecting to find drugs, was identified at trial as McCoy. After he and the other invader failed to find any drugs, McCoy made a telephone call in which one of the victims heard him report that "there was nothing in the house" (Tr. 1082). Evidence of telephone and cellphone tower records identified calls between phones of McCoy and Nix, both of which were in the immediate vicinity of the Hayward Avenue residence during the time of this robbery attempt; and both defendants' phones were tracked to the house of Nix's mother immediately thereafter. (*See*, *e.g.*, Tr. 3133-39.)

Thus, although Nix did not himself enter the home, the evidence was plainly sufficient to permit the jury to find him guilty of the Counts 3 and 4 substantive offenses of attempted robbery and firearm use on Hayward Avenue,

either by aiding and abetting the attempted robbery (*see generally* Part II.B.4. above) or on the *Pinkerton* theory of conspiratorial vicarious liability, to which we now turn.

### 3. *Nix's* Pinkerton *Challenge*

Nix contends that it was error for the district court to give the jury a *Pinkerton* charge, which informs the jury that it may find a defendant guilty of a substantive offense that he did not personally commit if it was committed by a coconspirator in furtherance of the conspiracy, and if commission of that offense was a reasonably foreseeable consequence of the conspiratorial agreement, *see Pinkerton*, 328 U.S. at 646-48. Nix argues that such an instruction was improper here, claiming that the evidence of conspiracy was "sufficiently thin that the charge invite[d] the jury" to "infer[] the conspiracy from the substantive offense." (Nix brief on appeal at 60.) This argument lacks any foundation in the evidentiary record or in the instructions as given.

To begin with, the court expressly instructed the jury that, in order to find a defendant guilty of a substantive offense committed by another person on this theory of conspiratorial vicarious liability, it must first find beyond a reasonable doubt that both the defendant and the person who actually committed the substantive

offense were members of the charged conspiracy at the time the substantive offense was committed, that the substantive offense was committed pursuant to the common plan of the coconspirators, and that the commission of the substantive offense was reasonably foreseeable to the defendant. (*See* Tr. 3819-21.) The court then reiterated that the jury could not find a defendant guilty on this theory of liability if it had not made all of the described preliminary findings. (*See id.* at 3821-22.) The court in no way invited the jury to infer the existence of a conspiracy from the performance of the substantive acts.

Further, the evidence supporting the charges of conspiracy was anything but "thin." As discussed above, the testimony of Gary, Moscicki, and Barnes, who were coconspirators of McCoy and Nix--which plainly was credited by the jury-- abundantly established the existence of a conspiracy, *i.e.*, an agreement among Nix, McCoy, Gary and Clarence Lambert, Barnes, and others to act together to commit home invasions, principally against persons thought to be drug dealers, and indeed established that Nix was the conspiracy's principal leader. We see no *Pinkerton* error.

D. *Resentencing*

When the district court sentenced McCoy and Nix in 2017, § 924(c)(1)(C) had been interpreted to require that a defendant convicted of multiple § 924(c) violations in a single prosecution be sentenced to consecutive 25-year minimum prison terms for the second violation and each subsequent violation. *See Deal v. United States*, 508 U.S. 129, 132-37 (1993). In 2018, however, Congress adopted the First Step Act (or "FSA"), amending § 924(c)(1)(C) "to provide that only a second section 924(c) conviction 'that occurs after a prior conviction under [section 924(c)] has become final' requires the consecutive minimum 25-year sentence provided by subsection 924(c)(1)(C)(i)." *United States v. Brown*, 935 F.3d 43, 45 n.1 (2d Cir. 2019) ("*Brown*") (quoting First Step Act, Pub L. No. 115-391, § 403(a), 132 Stat. 5194, 5221-22).

In supplemental briefing, defendants argue--in the event that their requests for a new trial and their challenges to the viability of any of their § 924(c) convictions are unsuccessful--that we should remand to the district court for reduction of their sentences on the surviving § 924(c) counts in light of § 403 of the First Step Act. McCoy and Nix argue that they are eligible for such relief because their convictions will not become final until appellate review rights have been exhausted.

76

While defendants' concept of finality is generally correct, its applicability here is unclear. With respect to the temporal applicability of its provisions, the First Step Act provides that its amendments to § 924(c) "shall *apply to any offense* that was committed before the date of enactment of this Act, *if a sentence for the offense **has not been imposed** as of such date of enactment*," FSA § 403(b) (emphases added). When an FSA reduction in sentence has been sought by a defendant who was sentenced before the FSA's date of enactment and who was not otherwise entitled to appellate relief on his § 924(c) convictions, courts have concluded that FSA relief was not available. *See, e.g.*, *United States v. Cruz-Rivera*, 954 F.3d 410, 413 (1st Cir.), *cert. denied*, 2020 141 S. Ct. 601 (2020) (interpreting Congress's focus on the time at which a sentence was "imposed" as intending to deny eligibility for FSA relief to any defendant originally sentenced prior to the FSA's enactment, reflecting the customary understanding that a sentence is "imposed either when it is pronounced or entered in the trial court, regardless of subsequent appeals" (internal quotation marks omitted)); *United States v. Jordan*, 952 F.3d 160, 174 (4th Cir. 2020) ("Congress decided to extend the more lenient terms of § 403(a) of the First Step Act to some but not all pre-Act offenders, with the date of sentencing in the district court drawing the line between those who are covered and those who are not." (internal quotation marks omitted)), *cert. denied*,

141 S. Ct. 1051 (2021); *United States v. Gomez*, 960 F.3d 173, 177 (5th Cir. 2020) ("A sentence is 'imposed' when the district court pronounces it, not when the defendant exhausts his appeals."). However, at least one court has held that as to a defendant who was originally sentenced prior to the FSA's date of enactment and whose "sentences were remanded prior to the First Step Act's enactment but who were not . . . resentenced" until after enactment, "both the text of the statute and Congress's purpose in enacting the legislation make clear that § 403 applies." *United States v. Henry*, 983 F.3d 214, 219 (6th Cir. 2020).

In *Davis*, the Supreme Court itself described Congress in the First Step Act as having "changed the law . . . *going forward*." 139 S. Ct. at 2324 n.1 (emphasis added). However, a week before *Davis* was filed, the Supreme Court in *Richardson II* had granted certiorari and remanded, stating, without other substantive comment, "[j]udgment vacated, and case remanded to the United States Court of Appeals for the Sixth Circuit for the court to consider the First Step Act of 2018, Pub. L. No. 115-391 (2018)," 139 S. Ct. at 2713-14--in a case that had been the subject of appellate review in the court of appeals and the Supreme Court for several years with respect to a sentence originally imposed on the defendant in 2013 and reimposed in 2017, *see Richardson I*, 906 F.3d at 421-22. Nonetheless, the Supreme Court denied further

78

review after the Sixth Circuit, following the *Richardson II* remand, concluded that retroactive FSA relief was unavailable to Richardson because "[i]n the general context of criminal sentencing, a sentence is 'imposed' when the trial court announces it, not when the defendant has exhausted his appeals from the trial court's judgment," *United States v. Richardson*, 948 F.3d 733, 748 (6th Cir.) ("*Richardson III*"), *cert. denied*, 141 S. Ct. 344 (2020) ("*Richardson IV*").

In *Brown*, we quoted the *Davis* Court's "'changed the law . . . going forward'" language, but we also stated that "at the resentencing, which will occur as a result of our remand, Brown will have the opportunity to argue that he is nevertheless entitled to benefit from section 403(b) of the [FSA]." 935 F.3d at 45 n.1.

Here too, as we have reversed defendants' convictions on Count 2 and are remanding for resentencing, we leave it to the district court in the first instance to consider the applicability of the First Step Act to McCoy and Nix in light of the possible temporal limitation on retroactivity dictated by Congress's reference to the time when a sentence was "imposed." We also note that although Nix adopts without elaboration the arguments made by McCoy for First Step Act relief, the results might not be the same for both defendants because, leaving aside common questions as to

the FSA's temporal applicability, differences in the criminal records of McCoy and Nix (*see* Part I.E. above) may dictate different outcomes.

                                    CONCLUSION

We have considered all of defendants' arguments on these appeals and, except as indicated above, have found them to be without merit. Defendants' convictions on Count 2 are reversed; their convictions on all other counts are affirmed. The matter is remanded for dismissal of Count 2 and for resentencing, including consideration by the district court of the First Step Act.

Should any appeal ensue after resentencing, either party may restore our jurisdiction pursuant to the procedure outlined in *United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994), in which event the appeal will be referred to this panel.